1822.

JAMES
v.
JOHNSON.

JAMES *against* JOHNSON and MOREY.

Where a mortgagee purchases or takes a release of the equity of re-
demption, the whole estate is vested in him, and the mortgage is ex-
tinguished ; but, in some special cases, where the intention of the
party is expressly declared at the time, or where some just and be-
neficial purpose is to be answered, as in case of an infant, the
mortgage may be kept on foot.

All dealings with a mortgagee, before notice of an assignment by
him, are valid.

The registry of an assignment of a mortgage, is not notice to a mort-
gagor, so as to render payments by him to the mortgagee, in his
own wrong ; but it is effectual notice to a subsequent purchaser or
mortgagee.

A *deed*, absolute on the face of it, but intended by the parties as a se-
curity merely for a debt, though registered as *a deed*, is valid and
effectual between the parties, as a mortgage; but it is liable to be
defeated by a subsequent mortgage, duly registered.

*Mortgage* creditors are *bona fide* purchasers, within the meaning of
the act of the 21st of *April*, 1818, (sess. 41. ch. 259.) relative to
judgments entered by confession on warrants of attorney, which de-
clares such judgments fraudulent and void, as against " other *bona
fide* judgment creditors," and " every *bona fide* purchaser," where
a particular specification of the consideration of the debt is not
filed.

THE defendant, *Caleb Johnson*, on the 24th of *June*, 1817, *August 30th, and October 28th.*
executed a bond and mortgage to *James O. Wattles*, to
secure the payment of 12,000 dollars, in one and two years.
The mortgage was registered the 17th of *July*, 1817. On
the 2d of *August*, 1817, a judgment was docketted in fa-
vour of *Wattles*, against *C. J.*, for 2000 dollars. There
were, also, three other judgments, in favour of different
persons, against *C. J.*, entered up in 1817, but subse-
quent to the abovementioned mortgage and judgment
in favour of *W.* Executions were issued on these judg-
ments, by virtue of which, the Sheriff, on the 20th of

1822.

JAMES
v.
JOHNSON.

*April,* 1818, sold all the right, title, and interest of *C. J.,* in the mortgaged premises. The lands were divided into four parcels, and sold separately. The first parcel was sold, under the first judgment, to *W. H. Sabin,* the highest bidder, for 205 dollars; and the other parcels were sold, under all the judgments, to *W.,* as the highest bidder, for 440 dollars, and he received a deed accordingly, from the Sheriff, which was recorded *April* 28th, 1818. No notice was given, at the sale, by *W.,* of his claim under the mortgage, or that the sale was made subject to it. On the 9th of *November,* 1818, *W.* assigned the bond and mortgage to the plaintiff, as security for his bond to the plaintiff, for 9331 dollars, of the same date, with a warrant of attorney to confess judgment thereon; and a judgment was, accordingly, entered the 12th of *November,* 1818. On the 14th of *June,* 1819, *W.* executed a quit-claim deed to the defendant, *Morey,* of all his estate and interest in the mortgaged premises, for the consideration expressed of 10,000 dollars. This deed was absolute on the face of it, and was acknowledged the 21st of *July,* 1819, and recorded, as a deed, the 13th of *January,* 1821. It was, however, intended as security for a note of *W.,* for 5000 dollars, endorsed by *Morey,* and discounted in the *Bank of Auburn,* and for his indemnity against a bond executed with *W.* to *A. P. Granger.* At the time of executing this deed, *W.,* also, delivered to *Morey,* the Sheriff's deeds to him and to *Sabin*; and, also, a quit-claim deed from *Sabin* to him, dated *May* 26th, 1819, which was, afterwards, recorded the 13th of *January,* 1821. *Morey* took possession of the mortgaged premises, and still continues in possession, holding the land under the deeds to him, as security for what *Wattles* owed to him; and he stated, in his answer, that *W.* was insolvent, and had absconded and gone out of the state. *Wattles,* and *A. P. Granger,* were partners in trade, at *Manlius,* in *Onondaga* county, and dissolved their partnership on the 1st of *November,* 1818; and soon after, *Wattles* and *Morey,* and one *T. J. Gilbert,* became part-

ners, and continued in business until *September*, 1819, when their partnership was dissolved; and *W.* and *M.* continued partners until *December*, 1819, when they dissolved their connexion in business.

The bill *prayed*, that the equity of redemption of the defendants in the premises, might be foreclosed, and that the deed to the defendant, *Morey*, of the 14th of *June*, 1819, might be delivered up and cancelled, and for general relief.

The bill was taken, *pro confesso*, against the defendant, *C. J.* The defendant, *M.*, in his answer, claimed to be a *bona fide* purchaser; and he denied all notice of the assignment of the bond and mortgage to the plaintiff, until some time in the autumn of 1820. He alleged, that the judgment entered up on the bond and warrant of attorney, in favour of the plaintiff, was fraudulent and void, under the statute of the 21st of *April*, 1818, for want of a particular specification of the consideration, as required by the statute; and he set forth the statute, and the specification filed, which was, that the sum, mentioned in the condition of the bond, was "for goods sold and delivered to *John Meeker*, the payment of which was assumed by the plaintiff."

*August* 30. The cause was brought to a hearing on the pleadings and proofs.

*Henry*, for the plaintiff, contended, 1. That the plaintiff, a *bona fide* assignee of the mortgage from *C. J.* to *J. O. W.*, was entitled to a decree of sale of the mortgaged premises, to satisfy the debts, for which the mortgage was assigned as security, with interest and costs.

2. That the deed of the 14th of *June*, 1819, from *W.* to the defendant *M.*, was, in fact, a mortgage, and intended merely as an indemnity to *M.*, against the note for 5000 dollars, endorsed by him, and the bond to *Granger.*

3. That if this deed ever had any operation against the

1822.

JAMES
v.
JOHNSON.

mortgage assigned to the plaintiff, it had been fully satisfied by the perfect indemnification of *M.*, against all the claims of *W.* and *G.*

4. That if the premises did not sell for enough to pay the principal, interest, and costs, that the defendant, *M.*, should be decreed to pay the costs of the suit, or such part thereof as the proceeds of the sale did not satisfy.

*Oakley*, for the defendants.

*October 28th.*   The cause stood over for consideration, until this day.

THE CHANCELLOR.   It will be sufficient to mention a few facts, to be selected from a minute detail in the pleadings and proofs, in order to present the questions that arise for consideration.

*Caleb Johnson* gave a bond and mortgage to *James O. Wattles*, to secure the payment of 12,000 dollars.   The mortgage was dated on the 24th of *June*, and registered on the 17th of *July*, 1817, and was payable in one and two years.   The mortgage, as *W.* frequently confessed, was given for a much larger sum than he had advanced to *J.*, and was intended to cover future advances.   On the 2d day of *August*, 1817, a judgment was docketted, in favour of *W.*, against *J.*, for 2000 dollars, and this judgment, as *W.* also confessed, was for part of the same debt, secured by the mortgage.   Upon this judgment, and upon three other judgments, in 1817, (but all of them subsequent to the mortgage,) executions were issued, and the mortgaged premises were sold on the 20th of *April*, 1818. The lands were divided into four parcels, at the request of the creditors, and sold separately.   The first parcel, under the earliest of the four judgments, was sold to *William H. Sabin*, and the other three parcels, under all the four judgments, were sold to *W.*, the mortgagee, who took the She-

riff's deed, and had it recorded, on the 28th of *April*, 1818. There was no notice given at the sale, by *W.*, of his claim to the premises, under the mortgage, or that the lands were sold subject to it. Neither the Sheriff, nor his deputy, nor *Sabin*, one of the purchasers, nor several other persons, who were present, and very attentive to all that was said and done, heard of any claim set up under the mortgage, or any notice given of it. Only one witness heard any mention made of the mortgage by *W.*, or any other person, at the sale ; and, if any such communication was made, it was a private and not a public communication. The sale to *Sabin* was first in the order of time, but the sale of the other parcels of the mortgaged premises was immediately after, at the same time and place ; and the whole may be considered as one connected transaction. Some of the witnesses, from observations of *W.*, conclude, that the mention of the mortgage, publicly at the sale, was intentionally avoided ; and, before the sale, *W.* had repeatedly mentioned, to different persons, that he had got a quit-claim deed from *Johnson* for the premises, and that the title was absolute and complete in him ; and he produced a paper, and exhibited it as the deed. *W.* took possession of the mortgaged premises soon after the sale, and, in the summer of 1818, he said, to different persons, that the property had been conveyed to him, and that his title to the premises was perfect, and that *Sabin* was the only person that could have any claim.

Under these circumstances, *W.*, on the 9th of *November*, 1818, assigned, under his hand and seal, the bond and mortgage of *Johnson*, and the premises therein described, to the plaintiff, as a collateral security, for a bond of that date, given for 9331 dollars, with interest ; and he annexed to the assignment a covenant, that there was then due on the bond and mortgage, the whole amount of the principal of 12,000 dollars. The assignment was so far a secret transaction, that it was not made known publicly, at or near

1822.

JAMES
v.
JOHNSON.

the mortgaged premises, which are in the village adjoining the *Onondaga* court house, until the autumn of 1820. The defendant, *Morey*, denies any knowledge of it until then ; and the proof that it was not publicly known, and the presumption that it was not known to the defendant until the latter part of the year 1820, is clear and decisive. There is nothing to contradict the answer, or to weaken the conclusion of fact, which is stated upon this point. It was recorded in the book of mortgages on the 12th of *November*, 1821.

On the 14th of *June*, 1819, *W.* bargained, sold, and quit-claimed the premises to the defendant, *M.*, in fee. The deed was acknowledged, before a commissioner, on the 21st of *July*, 1819, and recorded, as a deed, the 13th of *January*, 1821.

Prior to this deed to the defendant, *Sabin* had quit-claimed and assigned over all his right and title to any part of the mortgaged premises to *W.*, by his deed of the date of the 26th of *May*, 1819, and which was acknowledged on the same day, and recorded on the 13th of *January*, 1821.

The deed to the defendant, though absolute on its face, was given by way of security against a note for 5000 dollars, which the defendant had endorsed for *W.*, and against a bond of indemnity, which he had executed with *W.*, to one *A. P. Granger.* And *W.* had, afterwards, in *December*, 1819, or early in 1820, proposed to sell the land absolutely to the defendant, upon certain terms, which were fulfilled on the part of the defendant, but not on the part of *W.;* and the agreement failed in its execution. The defendant, since the execution of the deed to him, has been in possession of the premises, and still holds them as security for the balance due to him from *Wattles.*

Upon these facts, I am of opinion, that the defendant is entitled to be satisfied, out of the mortgaged premises, to the whole extent of the balance due to him.

1. When the mortgage was assigned to the plaintiff, *W.* had purchased the equity of redemption, in the greatest part of the premises, upon a sale on execution. He had united in himself the legal and equitable titles to all but the small part purchased by *Sabin.* He had, also, constantly declared, that the equity of redemption had been previously released by *Johnson,* and *Sabin's* title was, afterwards, assigned to him for a nominal consideration. The weight of evidence is, that *W.* claimed to be absolute owner of the whole of the premises, prior to the assignment of the mortgage, and we know, from the facts in proof, that he was owner of the legal and equitable title, excepting the small part of the premises covered by the Sheriff's deed to *Sabin.*

If he was entire owner of the whole title, as he constantly averred, before and after the sale, then, I think, the principle of law applies, that where the legal and equitable titles are united, the equitable title no longer exists; it is merged in the legal title, and is extinguished by the unity of seisin. If a person takes the legal estate by mortgage, and then, by his own act, takes the equity of redemption, and vests it in himself, the estate is discharged from the encumbrance. It would be a burthen to no purpose. This is the good sense and reason of the thing. Where debtor and creditor become the same person, there can be no right put into execution; it must, of course, be extinguished. This is the general rule, both at law and in equity; and, in equity, the merger is prevented, and the distinction of the estates preserved, *in special cases only.* It is where the intention of the party is distinctly declared, at the time, or where something just and beneficial requires the charge to be preserved, in a case in which the party has not declared, or cannot declare his intention. In the case of an infant, entitled to the estate, and, also, to a charge upon it, the Court will keep the rights distinct, if it be deemed most beneficial to the infant. (Lord *Rosslyn,* in Lord *Compton*

*Where the legal and equitable titles are united, the latter is merged in the former. As, if a mortgagee takes a release of the equity of redemption, the whole estate is vested in him, and the mortgage discharged.*

*But, in special cases, as where an infant is entitled to the estate, the charge may be preserved for his benefit; or, where the intention of the party is expressly declared at the time.*

v. *Oxenden*, 2 *Vesey*, jr. 261. and see, also, *Thomas* v. *Kemish*, 2 *Vernon*, 348.)    If it appear indifferent to the party, at the time of the union, whether the charge should or should not continue to subsist, it of course sinks.    I believe there is no instance to be found, in which the charge has ever been kept on foot by the Court, when third persons have been invited to deal with the party, on the legal presumption of merger, and when a fraud would be committed, if the merger was not admitted to operate according to the principles of law.

The question, in the late case of *Forbes* v. *Moffatt*, (18 *Vesey*, 384.) was between the real and personal representatives of *John Moffatt*, the mortgagee, and the whole case proceeded on rights growing out of the instrument itself. There was a mortgage, in that case, to secure the payment of 27,000 pounds to *A.*, and of 13,000 pounds to *J. M.*; and the mortgagor, afterwards, died, and devised all his estate, real and personal, to *J. M.*, and made him his executor.    The bill was by *A.*, to foreclose the mortgage for the 27,000 pounds, and it charged, that *J. M.* had taken possession under the will, and became absolute owner, and that his mortgage was thereby extinguished.    The widow and representatives of *J. M.* insisted, that the mortgage for the 13,000 pounds was still subsisting, and they prayed a sale, and an application of the proceeds to the two debts, *pari passu.*    The Master of the Rolls held, that a person becoming entitled to an estate, subject to a charge for his own benefit, may, if he chooses, take the estate and keep up the charge.    The question is upon the intention of the person, in whom the interests are united.    In most instances, it is, with reference to the party himself, of no sort of use to have a charge on his own estate ; and, where that is the case, it will be held to sink, unless something shall have been done by him to keep it on foot.    There was no such marked intention in that case by *J. M.*, and it was concluded to be for the benefit of his personal repre-

sentatives, that the mortgage should be subsisting, for, otherwise, there would be priority given to the other mortgage, and all the debts of his brother.

These equity cases never could have contemplated the preservation of the mortgage, after the mortgagee had purchased in the equity of redemption, merely to enable him, at some future time, to assign the mortgage, lying dead in his possession, to a creditor, instead of giving a new mortgage in his own name. This is not the beneficial purpose which the cases have in view, for it is pregnant with fraud and imposition. It is known when the mortgagee purchases in the equity. It is a matter of record. He declares himself owner, and acts as owner. How can mankind deal safely with him, if he can, at any time, secretly assign over that mortgage, and leave no trace of the assignment for inspection? He is complete owner upon record, for he appears to be mortgagee and purchaser of the equity. The policy of the law, especially in the recording counties, of which the county of *Onondaga* is one, is, that the title shall appear of record; but, by this new scheme of secret assignments of the mortgage, after the legal and equitable titles have been united, and that union declared of record, the policy of the law would be frustrated, and a purchaser would, in vain, endeavour to guard himself against this springing equity in some assignee.

If *Wattles* had possessed himself, as he asserted, of a release of the equity of redemption from *Johnson*, I should conclude, therefore, that the mortgage ought to be considered as extinguished, and not kept on foot for any purpose. There was no reason why it should be, and it was liable to be secretly assigned to the prejudice of the *bona fide* purchaser. There was no declared intention of *W.*, at any time before the assignment, that he should keep the mortgage as subsisting. All his declarations were that he was absolute owner. But as we have no evidence of such a release, but the parol declarations of *W.*, I do not think.

1822.

JAMES
v.
JOHNSON.

A secret assignment of a mortgage, by a mortgagee, who has purchased the equity of redemption, will not affect a subsequent purchaser.

1822.

JAMES
v.
JOHNSON.

*that* evidence sufficient, as between the present parties. We have, however, perfect proof, that he owned the equity of redemption, under the Sheriff's sale, to the greater part of the premises, when he assigned the mortgage   The legal and equitable titles were united, *pro tanto;* and I see no reason why the mortgage should not be *so far* extinguished.   *Sabin,* who owned the minor part, would have had to contribute rateably only towards the payment of the mortgage.   *W.* could not have been permitted to have levied the whole mortgage upon that part; it would have been deemed unequal and unjust.   If a man grants a rent-charge out of all his lands, and afterwards sells the lands by parcels to divers persons, the grantee of the rent-charge shall be restrained from levying the whole rent on one of the purchasers.   (1 *Eq. Cas. Abr.* 33. pl. 5.)   It would have been, in this case, peculiarly unjust, because *W.* was present when *Sabin* purchased his parcel of the premises, and he gave no notice of his encumbrance, as being then subsisting.   He had even declared to *Sabin* himself, before the sale, that he had an absolute deed of the property, and showed a paper, which, he said, was his deed.   The most that *W.* could have done, would have been to levy a rateable proportion of the mortgage debt, *and no more,* upon the part purchased by *Sabin;* but, I think it very questionable, whether he could have been permitted, under the circumstances, to have levied *any part* of the debt upon *Sabin's* property.

Whether a purchase of the equity of redemption to a part of the premises, by a mortgagee, will not extinguish the mortgage as to the whole?

It might, also, be made a question, whether the mortgage was not extinguished as to the whole premises by the purchase of the equity of redemption to a part.   The principle of the common law was, that an entire contract could not be apportioned.   Thus, if the grantee of a rent-charge purchased part of the land, out of which the rent issued, his remedy was extinguished, because, being an entire thing, there could be no apportionment of a rent-charge.   (*Litt.* s. 222. and *Coke,* ib.)   However, it is not

necessary to pursue this last suggestion further, nor do I mean to give any opinion upon it, because, whatever operation the mortgage and the assignment of it might have, as between the plaintiff and *Wattles*, who assigned it, I am entirely satisfied, that it could not be set up by *W.*, nor can it be set up by his assignee, to the prejudice of the rights of the defendant, who, before notice of the assignment, dealt with *W.* in the avowed character of owner of the premises.

2. It is an obvious principle of equity, that all dealings with the mortgagee, even in his character of mortgagee, before notice of the assignment, are valid. (*Williams* v. *Sorrell*, 4 *Vesey*, 389.) Much more strongly does this rule apply, if the mortgagee had assumed to be absolute *owner* of the land, and had, at the time of the conveyance, purchased *the entire equity of redemption* to the whole premises. This was the case at the time of the execution of the deed to the defendant. It would be a mischief not to be endured, for a secret assignee to be able to do what the assignor could not have done, to interpose a dormant mortgage, and destroy the title of the *bona fide* purchaser, or mortgagee. Suppose *W.* had not assigned the mortgage, and had given a mortgage to the defendant, would he have been able, afterwards, to bring forward his own mortgage? And, can he do that indirectly, by a secret assignment, which he could not do directly? The assignee has no right to complain. He dealt with a suspicious instrument, that ought to have put him upon inquiry. He knew, or was bound to know, for it was matter of record, that *W.* had purchased in the equity to at least three fourths of the premises, and why did he not take a new mortgage directly from *W.*, and put it upon record? Why did he not record the assignment? It fell within the words of the act, relative to the military titles. (Sess. 17. ch. 1.) " Every deed and conveyance, (except mortgages duly registered according to law,) of, or con-

*margin note:*
1822.

JAMES
v.
JOHNSON.

Dealings with a mortgagee, before notice of an assignment of it, are valid.

1822.

JAMES
v.
JOHNSON.

Though the registry of an assignment of a mortgage is not notice to the mortgagor, so as to render payments made afterwards, to the mortgagee, in his own wrong; yet, it is effectual as regards a subsequent purchaser or mortgagee.

cerning, or whereby any of the said lands may be any way affected, in law or equity, shall be adjudged fraudulent and void, as against any subsequent purchaser or mortgagee for valuable consideration, unless the same be recorded, &c." The assignment was a formal deed, and comes within the words and within the policy of the act. It was the only way by which *Wattles* could be prevented from practising a fraud; and as the plaintiff omitted to do this, until *November*, 1821, he, and not the defendant, ought to suffer by the omission. The registry act of 7 *Anne*, c. 20., has the same language with ours; and, in the case of *Williams* v. *Sorrell*, the assignment of the mortgage was duly registered. It was there held, that the registry of the assignment was not notice to *the mortgagor*, so as to render payments, afterwards, to the mortgagee, in his own wrong; but it was admitted, that a subsequent purchaser, or mortgagee, would be bound to look. This point is decisive in favour of the defendant, and gives his deed, taken by way of mortgage, the preference over the plaintiff's title.

3. The defendant's deed stands good as a mortgage for the two objects for which it was originally given. It ought, also, to cover the balance finally due to the defendant, on the dissolution of the partnership, and the settlement of their concerns. It appears fully in proof, that *W.* proposed, in *December*, 1819, or soon thereafter, to sell the premises absolutely to the defendant, which was the same thing as discharging the parol defeasance to the deed. The terms of sale were performed, in a great degree, on the part of the defendant, and not fulfilled by *W.* This might have laid a just foundation, in equity, for a specific performance of the agreement, or to consider the deed as discharged from the defeasance; but that is not the point before me. The defendant, himself, in his answer, seems to be content to hold the land only by way of security for his general balance; and, under the circumstances of this case, it is just and reasonable, that the deed should be retained

as a security for whatever may be due from *Wattles*, arising *after*, as well as before the date of the deed. He was treating with *W.*, all this time, as the person who had the absolute right and title to make the deed, and without any notice of the assignment of the mortgage, or that any claim was still existing under it. In many cases, a subject, pledged for a debt, may be considered as a security for further loans. Cases to this point, were referred to in *Hendricks* v. *Robinson*, and *Brinckerhoff* v. *Marvin*, (2 *Johns. Ch. Rep.* 309. and 5 *Johns. Ch. Rep.* 326.) and I see no possible objection to it, if no intervening right exists, to prevent the justness of the application of the rule; and the plaintiff has no such intervening equity. We are to presume, that further debts were created, or advances made, on *the credit* of this original security. It was a rule of the civil law, as was well shown by the Supreme Court of *Massachusetts*, in *Jarvis* v. *Rogers*, (15 *Mass. Rep.* 389.) that if the debtor pledged property to secure a debt, and, afterwards, another debt was contracted, the creditor might retain for both debts, provided there was nothing to negative the presumption of an implied contract, that the pledge should be so applied. In the present case, the deed being absolute in terms, and the defeasance, by agreement, resting in parol, the application of the deed, as a security for future responsibilities, of whatever kind, becomes more easy and flexible; and, as between the parties, it is perfectly plain, that it ought to be so held. It is only when the rights of third persons are prejudiced, by want of notice, &c., that the extension of the security is prevented; and here the plaintiff, under the circumstances, has no right to complain, considering what kind of security he took, and from whom, and that no notice of the assignment was given, until long after all the accounts had closed. It is a common principle of the Court, said Lord *Northington*, that wherever a purchaser or creditor, for valuable consideration, has got possession of a security, or satisfaction

*1822.*

JAMES
v.
JOHNSON.

A mortgage for a debt may be held as security for further loans, if there is no intervening right.

And though the deed is absolute in terms, and the defeasance is by parol, it is valid and effectual, as between the parties themselves.

for his debt, a Court of equity cannot take it from him, unless there is a superior equity on the other side.

The equities of the parties to the security of the fund are not equal. All the circumstances of the case show this. It would appear to me to be unreasonable, and very inequitable, to snatch this security from the defendant, who had bestowed all requisite vigilance, and placed confidence where he had a right to place it, and where the common sense and usages of mankind would have placed it, in the ostensible owner, claiming to be owner, and showing in himself the union of the legal and equitable titles. And if the fund is to be taken from the possession of the defendant, on whom is it to be bestowed? Can it be on the plaintiff, who took an assignment of a mortgage, with a covenant that the whole face of it was due, when the mortgagee was at the time in possession, and avowing himself to be the absolute owner, and when the records of the county showed that he had purchased in and extinguished the equity of redemption to a large proportion of the land, and when that assignment was neither made known to the public where the lands lay, nor recorded for nearly two years thereafter, and the assignee was suffered, all that while, to claim and deal with the land as the absolute owner, and to impose upon the public? In my apprehension, the equity of the two cases cannot stand a comparison.

The case of *Mills* v. *Comstock*, (5 *Johns. Ch. Rep.* 214.) is very much in point, and the doctrine there laid down goes very far to govern this case. *M.*, in 1807, gave a mortgage to *H.*, and in 1808, he conveyed to him the equity of redemption. In 1809, *H.* assigned the bond and mortgage to the defendant. In 1816, *H.* sold the premises to the plaintiff, who was a *bona fide* purchaser for a valuable consideration, without notice of the assignment. The mortgage and the release of the equity of redemption were recorded, but not the assignment, though the lands lay in the county of *Onondaga.* The defendant

was proceeding to foreclose the mortgage, and I held that
the legal and equitable title being united in *H.* the latter
was merged in the former, and that the assignment of the
bond and mortgage was fraudulent and void as against the
plaintiff.   It was observed, that " every person dealing
with *H.* had a right to presume, and was chargeable with
notice, that *H.* was the absolute owner, and that *M.* had
parted with his equitable title by his last deed, as he had
already parted with his legal title by the mortgage.   The
legal and equitable titles had united in *H.*, and the latter
had of course merged in the former.   When the defend-
ant took from *H.* an assignment of the bond and mortgage
of *M.*, he took no better title than *H.* himself had, in the
character of an original mortgagee, and he was chargea-
ble with notice of the release of the equity of redemption.
Whatever conveyance *H.* afterwards made of his interest
in the premises, that conveyance ought to have been re-
corded, in order to protect the party against subsequent
*bona fide* purchasers from *H.*   But the defendant did not
record the deed of assignment, and the subsequent pur-
chaser from *H.* had no means of knowing that the mort-
gage was still *regarded* as subsisting."

I have recently had another case before me, (*Starr
v. Ellis*,* decided *October* 18th,) in which, the mort-
gage and the equity of redemption having been united
by purchase in the defendant, he afterwards secretly as-
signed the mortgage, and then sold the land as his own.
I held, that the mortgage was extinguished by the union of
the titles, and that the subsequent assignment was fraudu-
lent and void.   The abuse to which these clandestine as-
signments of mortgages (and which in judgment of law
are extinguished by merger) are subject, ought to im-
pose upon persons who traffic in such securities, the duty
of making their assignments, as soon as possible, matter
of record.   If they do not, it is their own fault or negli-
gence, and they ought to suffer, rather than the subsequent
purchaser, who is deceived by appearances, and has no

1822.

JAMES
v.
JOHNSON.

*Ante,* p. 393.

1822.

JAMES
v.
JOHNSON.

notice or record to guide him. I am more and more in-clined not to extend equitable refinements upon the plain common law doctrine of merger. They never have been, and never ought to be, carried so far as to affect a sub-sequent purchaser, or judgment or mortgage creditor, without notice.

It will be perceived, that I have not laid any stress on the fact, that the deed to the defendant was recorded *as a deed,* prior to the record of the assignment in the registry of mortgages. The rights of the parties in respect to each other, as they appear upon the case, had become *fixed* long before either of these events. Nor can it be material, in any view, to the plaintiff, that the defendant took an absolute deed, though intended as a mortgage, instead of a mortgage in the usual form. All the claim and pre-tensions of the plaintiff are founded upon the prior regis-tered mortgage; and if the defendant had taken a mort-gage, and registered it, the pretensions of the plaintiff would have been the same. He has no ground of com-plaint as to the form of the instrument. A deed absolute upon its face, though taken by way of mortgage, is certainly a lawful instrument, and the party is only subjected to the hazard of having it defeated by a subsequent mortgage duly registered.

A deed ab-solute on the face of it, and registered as a *deed,* and not as a mortgage, though so in-tended, is legal and valid, but is liable to be defeated by a subsequent mortgage duly registered.

So, the defendant might, if he pleased, have insisted on the production of the mortgage, and that the record of it be cancelled before he accepted of a deed. This was a matter resting entirely in his discretion. The law will certainly not raise any presumption against the integrity or validity of the purchase from a person in possession, claiming to be absolute owner, and actually uniting in himself the legal and equitable titles, merely because the purchaser, under those circumstances, reposed confidence in the sincerity of his partner, instead of acting towards him with unremitting jealousy and consummate caution.

I shall, accordingly, direct a reference, to ascertain the

amount due to the defendant, and then order a sale of the mortgaged premises, to pay what may be reported and found due, with the costs of the defence, and the surplus, if any, to be applied to the payment of the plaintiff. The plaintiff has not shown any priority of title to the fund by reason of his *judgment* against *Wattles*. That judgment was entered by confession upon warrant of attorney, and required a particular specification of the consideration of the judgment, under the act of the 21st of *April*, 1818. The specification that was made and filed when the judgment was confessed, was defective, and did not fulfil the requisition of the statute. The case of *Lawless* v. *Hackett*, (16 *Johns. Rep.* 149.) is in point ; and that case appeared to me when the same question arose in *Brinkerhoff* v. *Marvin*, (5 *Johns. Ch. Rep.* 320.) to have given the true construction of the act. And if the specification was not given as the act required, the judgment is to be deemed fraudulent, in respect to other *bona fide* judgment creditors, and to " every *bona fide* purchaser for a valuable consideration of any lands affected by such judgment." The defendant was, doubtless, a purchaser within the meaning of that act. The parol defeasance accompanying his deed, and declaring it to be taken by way of security for debt, did not make it less a purchase, and it was certainly a purchase founded on a valuable consideration. The deed taken by the defendant was within the terms, and within the policy of the act. He was equally within the mischief that the law intended to prevent. Can we suppose that the act intended to protect subsequent judgment creditors, and subsequent purchasers, and not subsequent mortgage creditors, who are not only creditors, but actually purchasers of the legal estate ? I cannot admit, that there remains any doubt as to the application of the statute to the case of the defendant ; and if so, the amended specification, filed in *August*, 1819, subsequent to the defendant's deed, cannot affect him, for he had become *vested* with the

1822.

JAMES
v.
JOHNSON.

Where on a judgment entered by confession, on a warrant of attorney, a specification of the consideration is not filed, pursuant to the statute, it is fraudulent and void, as against subsequent judgment creditors, and *bona fide* purchasers; and subsequent mortgage creditors are considered and regarded as creditors and purchasers, within the meaning of the act.

better title.   Even if he had notice of the judgment prior to his deed, it could not have weakened his right to the protection of the statute.   Every subsequent purchaser and judgment creditor may be supposed to have notice of the judgment, for it was docketted, and if such notice was of any avail, it would have entirely frustrated the effect of the statute.

It was, therefore, declared, that the defendant was entitled to hold the land under his deed, as a valid security for the objects for which it was originally taken, and for the balance due on the dissolution of the partnership between him and *W.*, in *December*, 1819, and to receive payment out of the proceeds of the mortgaged premises prior to and in preference of any claim or demand of the plaintiff stated in his bill ; and a reference was directed, to ascertain the balance due to the defendant, with interest, and with liberty for the master to assume the settlement mentioned in the case, if the same should appear to have been fairly made and assented to, and to include certain items of account stated as not being included in that settlement, if it should appear to him that the same ought to be allowed ; and that upon the report being made and confirmed, a sale of the premises be had, and the debt and costs of the defendant first paid out of the proceeds, and the residue applied towards satisfaction of the plaintiff's debt against *Wattles*, and his *costs* of this suit.

Decree accordingly.