HENRY E. SEYMOUR v. MERRITT S. DARROW AND LAWRENCE BRAINERD.

[IN CHANCERY.]

*Mortgage.*

In February, 1851, D. executed to S. a mortgage of real estate, conditioned for the payment by him to S. "of all the notes and agreements I now owe or have with him, or I and others jointly and severally have with him." At this time S. held two notes against D. for two hundred and thirty dollars each, and also a note for one thousand dollars, signed by D. and another person, payable on demand with interest, and expressed upon its face to be collateral to secure him for any demand or liability he then had, or might thereafter have against or on account of D. S. subsequently delivered up the two two hundred and thirty dollar notes to D., and took from him his note for the balance due upon them. He also, in reliance for his security upon the collateral note and the mortgage, assumed certain liabilities as indorser for D. within the amount due upon that note, and was obliged to pay them. In January, 1854, D. having become insolvent, executed to B., his creditor, a mortgage of the same land to secure his claim. B. saw the record of the mortgage to S., and directly after taking his mortgage, caused the papers of S., who was then absent from home, to be examined for the purpose of ascertaining whether he had any claim within the mortgage against D. The person who examined the papers saw the collateral note for one thousand dollars, but supposing that the mortgage did not cover any debts not existing at the time of its execution, reported to B. that there was nothing of any consequence due to S. under this mortgage.

*Held*, 1st, that the two notes of two hundred and thirty dollars each, held by S. at the date of the mortgage, were secured thereby; and that the security also embraced the note given by D. for the balance due upon these notes.

*Held*, also,—POLAND, J., dissenting,—that the collateral note or agreement for one thousand dollars was secured by the mortgage, being embraced within the words " all the *notes and agreements* I now owe or *have* with him," and that therefore the payments made by S. upon his liabilities as indorser, assumed in reliance upon this note, were also secured by the mortgage.

When a note, secured by a mortgage, is given up and a new note given for the amount due upon it, the mortgage security is not thereby released, either as to the mortgagor or.subsequent incumbrancers, in the absence of any agreement or understanding that the transaction should have that effect.

APPEAL from the decree of the court of chancery. This was a petition for the foreclosure of a mortgage. The following facts appeared in the case:

On the 27th of August, 1850, Merritt S. Darrow and Jay F.

Darrow executed and delivered to the petitioner the following written instrument: "Value received, I promise to pay to the order of Henry E. Seymour one thousand dollars, on demand and use, and this note is collateral and to secure said Seymour any note, demand, agreement or liability he has of, against, by, or on account of me, or me and my brother Jay F. Darrow, or for any trouble, cost or expense in relation thereto, and also to secure him any note, demand, agreement or liability for or against me, and me and said Jay, which may be made or accrue to said Seymour hereafter with my consent, until the mortgage securing this is cancelled." At the same time, Merritt S. Darrow executed and delivered to the petitioner a mortgage deed of certain real estate in St. Albans, conditioned for the payment of two notes signed by him and J. F. Darrow, for two hundred and thirty dollars each, due March 14th, 1851, and payable to the petitioner or order, and also for the payment of the collateral note for one thousand dollars, above set forth, its terms being recited in full in the mortgage. This mortgage, however, was not recorded until October 16, 1854.

On the 25th of February, 1851, Merritt S. Darrow executed and delivered to the petitioner the mortgage sought to be foreclosed. This mortgage was recorded March 17, 1851, and was conditioned for the payment, by the mortgagor to the petitioner, of " all the notes and agreements I now owe or have with him, or I and others jointly and severally have with him," and also for the payment of a note of one thousand dollars, dated February 25, 1851, signed by the mortgagor and another person, and payable at the Franklin County Bank, on which the petitioner was surety. In the record of this mortgage, the words "or I" between the words " with him" and the words " and others" in the foregoing condition were omitted, and the omission was not corrected upon the record until after January 31st, 1854, when the mortgage to the defendant Brainerd was executed.

At the date of the execution of this last mortgage to the petitioner, he held the two notes of two hundred and thirty dollars each, and the one thousand dollar collateral note, described in the first mortgage, executed August 27, 1850. On the 14th March, 1853, the petitioner delivered up to Merritt S. Darrow the two notes

for two hundred and thirty dollars each, and took his note for four hundred and twelve dollars and ten cents of that date, payable to the petitioner's order, on demand, with use, that sum being the balance then due upon those notes. This note and the collateral note of one thousand dollars, the petitioner held at the time of the trial of this cause. Subsequent to February 25, 1851, and prior to January 31, 1854, the petitioner indorsed certain notes for Merritt S. Darrow, upon which he had been obliged to pay one thousand one hundred and thirty-nine dollars and thirty-six cents. These notes were indorsed by the petitioner, in reliance for his security for so doing upon the collateral note of one thousand dollars, and the mortgage of February 25, 1851. The one thousand dollar note, payable at the Franklin County Bank, and specifically secured by the mortgage of February 25, 1851, was paid by M. S. Darrow, and an indorsement was made upon the collateral note of one thousand dollars, above described, to that effect, and also that the petitioner had no claim in respect thereto.

Upon the mortgage of August 27, 1850, was an indorsement signed and sealed by the mortgagor, and dated November 3, 1852, confirming that mortgage, for the purpose of removing any question as to the homestead exemption; the mortgagor, as such indorsement stated, having at the date thereof ceased to occupy any part of the mortgaged premises as a homestead.

This mortgage of August 27, 1850, was in M. S. Darrow's possession from the date of this indorsement until sometime in January, 1854, when Darrow, upon being applied to by the petitioner's brother, during the petitioner's absence at the west, for the mortgage, gave it up to him. The testimony of the petitioner was positive that this mortgage was never cancelled nor given to Darrow for that purpose, and that it was through some accident or mistake that it remained in his possession so long.

In October, 1853, the petitioner went west, and remained there until after all the events hereinafter related.

On the 31st of January, 1854, M. S. Darrow, having failed the evening before, executed to the defendant Brainerd, to whom he was indebted, a mortgage deed of the same land covered by the mortgage now sought to be foreclosed; and this mortgage to Brainerd was recorded the same day of its execution. Previous

to taking this mortgage, Brainerd examined the records of deeds in St. Albans, and found the record of the petitioner's mortgage of February 25, 1851. He inquired of Darrow what was due upon that mortgage, and Darrow replied that there was nothing of any consequence due thereon, as the one thousand dollar note to the Franklin County Bank had been paid by himself.

On the 1st February, 1854, Brainerd sent R. H. Hoyt to Henry Seymour, the father of the petitioner, and with whom he had left his papers, with instructions to examine them for the purpose of ascertaining whether the one thousand dollar note payable at the Franklin County Bank, and specifically described in the condition of the mortgage of February 25, 1851, had been paid. Hoyt went immediately to Henry Seymour, who showed him all the papers of the petitioner in his hands. Hoyt saw the collateral note of one thousand dollars, and from the indorsement upon it learned that the one thousand dollar note at the Franklin County Bank was paid, and he so informed Brainerd.

M. S. Darrow absconded on that evening, and on the next day Horatio P. Seymour, the brother of the petitioner, showed to Hoyt the unrecorded mortgage of February 27, 1850, which he had received of Darrow a short time previous, as above stated, and Hoyt informed Brainerd of the existence of that mortgage, and this was the first intimation that either Hoyt or Brainerd had of that fact.

The chancellor made a decree for the amount due upon the note of four hundred and twelve dollars and ten cents, taken in lieu of the two notes of two hundred and thirty dollars each, and for all the payments above described made by the petitioner as indorser for M. S. Darrow. From this decree the defendant Brainerd appealed.

*H. R. Beardsley* and *H. E. Seymour,* for the petitioner.

1. The two notes for two hundred and thirty dollars each, held by the petitioner at the time of the execution of the mortgage, were clearly embraced within the terms of the condition "all the *notes* and agreements *I now owe*, or have with him;" and if so, the note for four hundred and twelve dollars and ten cents, given for the balance due upon those notes, is also secured by the mortgage;

*McDonald* v. *McDonald*, 16 Vt. 631; *Dunshee* v. *Parmalee*, 19 Vt. 172; 1 Hilliard on Mortgages, chapter 17, section 8, Ed. of 1856.

2. The payments made by the petitioner upon his indorsements for Darrow after the execution of the mortgage, are secured by the collateral note or agreement for one thousand dollars, dated August 27, 1850; and this collateral agreement is also embraced within the terms of the condition of the mortgage of February 25, 1851, "all the notes and agreements I now owe, or *have* with him." The mortgage is certainly good to this extent as against Darrow, and also against subsequent mortgagees having either actual or constructive notice of its scope and purpose; and to constitute sufficient notice thereof, the condition need not be so certain as to preclude extraneous inquiry, but it is enough if it be stated in such a way, that by the exercise of common prudence and ordinary diligence its extent can be ascertained.

In Hoyt's examination of the petitioner's papers he saw this very collateral agreement, and was bound to take notice of it; and he would have undoubtedly done so had he not mistaken the law, and supposed that only debts due at the date of the mortgage were secured by it.

Brainerd therefore was fully notified of the existence of this agreement, and his ignorance of the law in regard to the construction of the mortgage will not aid him; *Shirras* v. *Cary*, 7 Cranch 34, 50, 51; *McDonald* v. *Colvin*, 16 Vt. 300; Hilliard on Mortgages, (Ed. of 1856) chap. 12, sec. 53, *et seq.*, and cases there cited; *Gibson* v. *Seymour*, 4 Vt. 518; *McDonald* v. *McDonald*, 16 Vt. 173.

3. If the omission of the words "or I" in the record of the petitioner's mortgage is of any consequence in itself, still, the clerk's certificate upon the mortgage of its registry, is conclusive and can not be contradicted as against the petitioner, even by the record itself; Hilliard on Mortgages, Ed. of 1856, chap. 47, secs. 54, 55; *Ames* v. *Phelps*, 18 Pick. 314.

4. The fact that the unrecorded mortgage was in Darrow's possession, does not create a conclusive presumption that it was cancelled; and the testimony shows positively that it was not cancelled; 2 Phil. Ev. 145.

*B. H. Smalley* and *W. W. White*, for the defendant Brainerd.

1. The collateral note for one thousand dollars, by its own terms, ceased to have any force upon the delivery of the unrecorded mortgage of August 27, 1850, to Darrow, because this amounted to cancelling the mortgage.

2. The record of the condition of the mortgage of February 25, 1851, by which alone the rights of the petitioner as against subsequent mortgagees are to be governed, was so indefinite and vague as not to amount to any notice to Brainerd of the claims now sought to be enforced under it.  And even the condition of the mortgage itself, if rightly recorded, is inoperative as against Brainerd, except as to the notes specifically described.  It does not designate the note and agreements intended to be secured. No dates, no amounts are given; the nature of the claims, the subject of the agreements, and the persons holding them are not stated.  To sustain this condition to the extent claimed by the petitioner, completely defeats the spirit of the registry laws. *Pettibone* v. *Griswold*, 4 Conn. 158 ; *Stoughton* v. *Pasco*, 5 Conn. 342 ; *Shepard* v. *Shepard*, 6 Conn. 47 ; *Crane* v. *Deming*, 7 Conn. 387 ; *Hart* v. *Chalker*, 14 Conn. 77.

The terms of the condition of the mortgage can not fairly be construed to extend to *future* advances or liabilities ; to warrant such a construction, it must either refer in express terms to future advances, or it must set forth a specific sum, as intended to be secured, and then the advances can not exceed such sum.   1 Hilliard on Mortgages 210, secs. 52 and 53 ; 4 Kents Conn. 175–6 ; *St. Andrew's Church* v. *Tompkins*, 7 John. Ch. 14 ; *Hart* v. *Chalker*, 14 Conn. 77 ; *Sanford* v. *Wheeler*, 13 Conn. 165 ; *Merrill* v. *Swift*, 18 Conn. 257 ; *Lewes* v. *Deforest*, 21 Conn. 427 ; *North* v. *Belden*, 13 Conn. 376 ; *Bacon* v. *Brown*, 19 Conn. 29 ; *Bank of Utica* v. *Finch*, 3 Barbour's Ch. 302.

3. Brainerd made every inquiry required by common prudence under his state of knowledge of the facts of the case, derived from all the evidence before him, and was misled by reason of the absence of the petitioner, and his negligence in the mode of drawing and recording his mortgage, in not fully informing his agent in whose possession he left his papers, what his claim against Darrow was, and in having his papers so blindly drawn.

In such a case the rights of the diligent and deceived subsequent mortgagee should not be prejudiced by the negligence of the prior encumbrancer.

REDFIELD, Ch. J.   This is a bill to foreclose the equity of redemption in land, mortgaged to the plaintiff by the defendant M. S. Darrow, February 25, 1851.   The defendant, Brainerd, had a mortgage upon the same premises, or part of the same, from M. S. Darrow, dated January 31, 1854.   The only question in the case was in regard to the validity and extent of the plaintiffs mortgage as against Brainerd.   The plaintiff's mortgage was expressed upon the registry in these words :  " All the notes and agreements I now owe, or have with him, and others jointly and severally have with him ;  also, if I pay a note of one thousand dollars of this date, to the Franklin County Bank, signed with me and another, as surety by said Seymour."   It appeared in proof that in making the registry, the words " or I," were omitted at the end of the first line and between " him" " and others."

It appeared in proof, also, that at the time of the execution of this mortgage, which was recorded on the 17th of March, 1851, the plaintiff held another mortgage against M. S. Darrow, dated August 27, 1850, which was not recorded until after Brainerd's mortgage.   This unrecorded mortgage described two promissory notes of two hundred and thirty dollars each, falling due March 14, 1851, signed by M. S. Darrow and J. F. Darrow, also a promissory note of the same date with the deed, for one thousand dollars, (signed also by M. S. and J. F. Darrow,) collateral and to secure the plaintiff any note, demand, agreement or liability which he then owed the plaintiff, or he and J. F. Darrow owed or had with the plaintiff in any form whatever, or any future note or liability the plaintiff should thereafter assume on behalf of M. S. Darrow, or of him and J. F. Darrow, in the most extended terms.   The notes above described the plaintiff held at the time of the execution of the mortgage of February 25, 1851.   The one thousand dollar note, which was described in the mortgage of 1850, the plaintiff has ever since retained, and between the date of the mortgage of 1851, and that of Brainerd's mortgage,

Seymour *v.* Darrow et al.

he had assumed and paid a considerable sum coming within the terms of the condition of the note, and assumed in faith of its being secured by that note and the mortgage of the 25th of February, 1851. The two notes for two hundred and thirty dollars each had been given up to M. S. Darrow, and another note executed for the amount due upon them, between the date of February 25 and January 31, 1854, which is still due to the plaintiff.

The chancellor made a decree for the amount due upon this last note, and the amount assumed and paid by the plaintiff according to the terms of the condition of the note of one thousand dollars. There was an indorsement upon this last note, showing that the one thousand dollar note to the Franklin County Bank, described in the mortgage of 1851, had been paid by M. S. Darrow, and that the plaintiff had no claim on account of it.

I. The first question in regard to the balance due upon the two two hundred and thirty dollar notes, is not one upon which there is any difference of opinion among the judges who heard the case. It is perfectly well settled that the change of securities is no discharge of the mortgage, unless that was the intention of the parties, or unless securities of a lower grade are merged in those of a higher one. This subject is discussed at length in *Dana* v. *Binney*, 7 Vt. 493 and in *McDonald* v. *McDonald*, 16 Vt. 630, and *Dunshee* v. *Parmalee*, 19 Vt. 172. The rule upon this subject, is thus held, in those cases : When a note, secured by a mortgage, is given up and a new note given for the amount due upon it, the mortgage security is not thereby released, either as to the mortgagor or subsequent incumbrancers, in the absence of any agreement or understanding, that the transaction should have that effect. And in regard to the case of taking security of a higher grade, as a specialty for a simple contract, it is probable that a court of equity would, even in that case, relieve the parties from the legal consequence of the merger, when it could be done without injustice to other parties. *Slocum* v. *Catlin*, 22 Vt. 137. This case, then, stands the same as if the original notes had been kept on foot. 1 Hilliard on Mort. vol. 1, p. 449, and cases there cited. This very accurate writer says : "The general rule is that nothing but actual payment of the debt or an express

10

release will operate as a discharge of a mortgage. The lien lasts as long as the debt. So far has this principle been carried, that where indorsers and sureties have taken indemnity by way of mortgage for the first guaranty, it has been held to extend to every change of the form of the guaranty, and even when the original paper has been changed for other paper many times, and different names upon the subsequent paper, and for different sums, provided only the same debt in substance continued unpaid, and this where the mortgage only extended to the first guaranty." 1 Hilliard on Mortgages 449, 450, 451. And this change does not affect the security as to *bona fide* subsequent incumbrancers or levying creditors. *Pomroy* v. *Rice*, 16 Pick. 22. Hilliard on Mort., *supra*.

In this view the two notes for two hundred and thirty dollars each, are in terms described in the condition of the mortgage of February 25, 1851, upon which this bill is predicated. The words of the deed are, " all the notes I now owe, or have with him." No terms more explicitly embracing those notes could be conceived of. Unless then, the amount or description of the securities intended to be included in the mortgage, is required to be specified in the condition, nothing more specific could be expected. And that idea seems now entirely abandoned. Indeed, since the decisions in regard to the right of the parties to change the form of the security to an indefinite extent, and even to unite the debt, secured by the mortgage, with others not so secured, without affecting the validity of the security, even as to subsequent *bona fide* incumbrancers, there could be no possible importance in giving any definite description of the present form of the debt intended to be secured, since it might undergo any number of mutations without impairing the security. And as to the mortgage stating the amount of the debt or its upward limit, as some of the cases have insisted was indispensable, it seems now to be regarded of no importance. For if the mortgage were to limit the amount of the security, as not exceeding two thousand dollars or two hundred thousand dollars in all, either of which sums might be adopted with equal propriety, when the sum really intended to be secured was less than fifty dollars, it is obvious it could afford no security against possible

fraud. The remarks of the court in *Bourne* v. *Littlefield*, 29 Me. 302, are strikingly true in regard to the present state of the law upon this subject; "When the rule is once established, that the mortgage debt will remain secured, after a change in the evidence of its existence, it becomes apparent that it would be wholly unsafe to rely in any case upon the statement of the amount in the mortgage." There can be then, as we all think, no question but that the notes then in existence were sufficiently described in the condition of the mortgage, and having been merely changed, but the debt not paid, the orator must be regarded as clearly entitled to a decree of foreclosure for the amount remaining due upon them.

II. The other question in the case, which seems more difficult in form, will be found, upon examination, not to involve different principles from the first question discussed. It being admitted that it is not requisite that the mortgage itself should contain a description of the form of the debt intended to be secured, but that subsequent purchasers and incumbrancers, as well as creditors, must look beyond the deed, and make reasonable inquiry in regard to the existence and amount of the debts intended to be secured, the only question is, whether the deed, if it contains any attempt at description of the debt, so describes it as to put those interested upon the hopeful course of inquiry ; that is, in substance, whether as far as it goes, it points to the debts, and does not tend to put any one upon a false inquiry. For since it has been decided in this State that an absolute deed, if intended to secure a debt or duty, and given and held for that purpose, is a valid mortgage, not only as to existing debts, but also as to subsequent advances and liabilities assumed on behalf of the grantor, by the grantee, *Gibson* v. *Seymour*, 4 Vt. 518, (and the case has never been qualified or questioned, in this State, but has been constantly acted upon for the last twenty-five years), it could not with much plausibility be claimed that any expressed condition in a mortgage could defeat the security, unless it had a tendency to mislead those interested.

The condition in this mortgage, as recorded, most unquestionably included all notes and agreements between the plaintiff and M. S. Darrow, or where they were parties with other parties.

Unless we give the language this signification, it either has no meaning, or an absurd one. No serious question has been or can be made, that this is the fair construction of the language used. This one thousand dollar note with its extended condition, if it be a *note* or *agreement*, and it surely can be nothing else, was in terms included in the condition of the mortgage, as really and as truly as the two other notes of which we have spoken. Why, then, shall not the plaintiff be entitled to his foreclosure for the amount which he has assumed and paid under this note?

Something was attempted to be made out of the fact of the mortgage of 1850 being found in M. S. Darrow's hands, as if it might have been surrendered as cancelled, and thus virtually prove this one thousand dollar note extinguished, which by its terms was only to remain a continuing security for future liability incurred, until the " mortgage securing it was cancelled." But it seems to us the proof shows very fully that this mortgage was never surrendered to M. S. Darrow with any such intent. Seymour so swears explicitly, and Darrow never made any such claim, but surrendered it to Seymour's brother without objection, admitting in effect, that he had no right to retain it.

And the indorsement upon this deed, expressly confirming it, as late as November, 1852, shows very conclusively that it was intended to be kept on foot after the execution of that of 1851. The inquiry naturally arises why the parties should desire to keep these two mortgages on foot, for the same general object, to secure the plaintiff when M. S. Darrow owed him, and when he had indorsed for him. But it seems to us this is not difficult to conjecture. The plaintiff seems to have been Darrow's confidential friend and indorser to some extent. It was the object of both to keep the plaintiff wholly secure, but to do it in a manner not to excite suspicions against the solvency or credit of Darrow. The mortgage of 1850, as the proof shows, was made to be used in case of emergency, in lieu of an attachment. But lest even this expedient might fail through some accident, the mortgage of 1851 was made still more general, so as, if possible, to answer the purpose of security, and at the same time not jeopard the credit of Darrow. To this end it was made in general terms. And the deed of 1850 was intended to be still retained to be used as before, if

a rupture of Darrow's affairs should occur, so as to save all question in regard to the general nature of that already recorded.

It may be said this manifests a disposition in the parties to keep off the registry the facts which might be important to other creditors or purchasers. That is always so, as far as the thing is allowable. And it was upon this ground that some of the early cases upon this subject undertook to maintain the rule, that the mortgage should specify the nature of the debt intended to be secured. *Pettibone* v. *Griswold*, 4 Conn. 158. And in many of the States, express statutes require that in case of mortgages, the defeasance shall be registered. Hence an absolute deed given to secure a debt is held fraudulent and inoperative as against subsequent incumbrances. *Dey* v. *Dunham*, 2 Johns. Ch. 182 ; *James* v. *Johnson*, 6 Johns. Ch. 432. But these cases have not been followed in this State, as we have before shown. And the case of *Pettibone* v. *Griswold*, is certainly not now regarded as law in Connecticut. All that is now required there is that the debt should be described with such convenient certainty as the case admits of. *Stoughton* v. *Pasco*, 5 Conn. 442 ; *Hart* v. *Chalker*, 14 Conn. 79 ; *Merrills* v. *Swift*, 18 *id.* 257 ; *Sandford* v. *Wheeler*, 13 *id.* 165 ; *Lewes* v. *De Forest*, 20 *id.* 427 ; *Mix* v. *Cowles*, *id.* 420. See also, *Helman* v. *Teeple*, Saxton's R. 232 ; 1 Hilliard on Mort. 285–297.

It has in some of the States been held that the debt must either be described in the condition, so that its identity can be traced, or some intimation given where such information may be obtained upon inquiry. *Garber* v. *Henry*, 6 Watts 57 ; *Gardner* v. *Webber*, 17 Pick. 414 ; *Commercial Bank* v. *Cunningham*, 24 Pick. 274 ; *James* v. *Johnson*, 6 Johns. Ch. 429.

But it is obvious from what has already been shown, that this is not now regarded as the sound rule upon the subject. All that is now required is that the extent of the mortgage should be described in general terms, " as all I now owe, or may hereafter owe the mortgagee." This is expressly decided in this State in *McDaniels* v. *Colvin*, 16 Vt. 300 ; and this is undoubtedly the generally recognized rule upon this subject. Those interested must then make their inquiries in the proper quarter. We all

concur in this, else we could not regard the first two notes as properly secured by the mortgage.

But this is all which is required, to include the debts assumed under the one thousand dollar note. The condition includes this as much as the notes, which created a present indebtedness. And the very form of the condition naturally indicates something beyond a *present debt.* It is " all the notes and agreements I now owe, or *have* with him." Thus showing that the security went beyond *present indebtedness,* but not beyond some *existing agreement* between the parties, showing at once what the agreement probably was, that is to secure either a mere inchoate liability, like that of suretyship, or else some future advance or guaranty, and also, when it might be found in the usual place of looking for agreements, in the hands of the party *to be benefited by them.*

No case can be found where any distinction was made between a mortgage to secure future advances and present indebtedness ; or at all events no such distinction is regarded as sound, in regard to the validity of a mortgage security, by any recent decision. The case of *McDaniels* v. *Colvin* certainly shows a description of the debt far more indefinite than the present, " also what I may owe him on book," which the court construed as extending to an indefinite extent *in futuro,* or until express notice of some subsequent incumbrances or interest, the holder of such mortgage not being bound to watch the registry for *subsequent* conveyances, in order to limit his credit under this condition. And this case in principle is in strict conformity with the recent and authoritative determination upon the subject. *Shirras* v. *Caig,* 7 Cranch 34, MARSHALL, Ch. J. ; *Treescott* v. *King,* 6 Barb. 346 ; *Stuyvesant* v. *Hall,* 2 Barb. Ch. 151.

It would be wonderful if a general description of one species of contract, as promissory notes, should be held perfectly valid, and another, as a contract of indemnity against present or future indorsements, should be regarded insufficient. And it would be still more remarkable that a contract of indemnity, against the consequences of indorsement already made, should be held well described in the condition of a mortgage, by general terms, but that a contract to indemnify against future indorsements should

be specifically described, in order to be valid, when both contracts must equally look to a future time for the fixing of the debt. The truth is, no such distinction can be maintained upon principle, or with any fair show of plausibility.

So that whatever fair argument there may be against allowing the plaintiff a foreclosure upon his notes, which did constitute a present indebtedness, upon the ground they were not specifically described, there is none whatever in favor of making any distinction between the description of the first notes and the one thousand dollar note. No merely practical and unprofessional man would ever regard any such discrimination as tenable. It is very obvious from the proof in the case, that the defendant Brainerd never acted upon any such distinction, and his counsel did not, at the time, advise him of the practicability of any such division of the plaintiff's claim under the mortgage. It is very manifest that the view, which then occupied their minds, was the one made in the early Connecticut cases, between those notes, which were specifically described, and those which were not. Mr. Brainerd says, his anxiety was to know if the one thousand dollar note, which is specifically described in the condition of the mortgage upon the registry, were still subsisting. He urged Hoyt to examine the plaintiff's papers with that view, and when assured that this note had been paid by Darrow, " *he felt secure.*" Hoyt looked beyond that somewhat. And in fact it is very obvious that Hoyt saw the one thousand dollar note now in question, and that he obtained his information, in regard to the other one thousand dollar note being paid by Darrow, from the indorsement upon the back of this note. So that had he really known the law at the time, that the mortgage was a valid security for the performance of all agreements between the parties, he would have fallen at once into the proper channel for finding all the information he required, from the plaintiff's papers. The requisite information in regard to the one thousand dollar note was more accessible, in fact, than in regard to the other notes, which had been changed.

But Brainerd was in law bound to inquire of the plaintiff, and the fact that he was not at the time at home could make no difference. The plaintiff is not bound to remain always at home in order to give the requisite information in regard to his mortgages.

Nor is he to lose his security because the person, with whom he leaves his papers for the time, does not happen to know all that the plaintiff knew in regard to them. No such thing has been claimed in the case, nor could it be with the least plausibility.

But it is apparent that the defendant Brainerd did not seek any information except of Darrow, who was certainly not the proper party to make such inquiry of, in regard to any matter referred to in the condition of the plaintiff's mortgage, until after he had taken *his* mortgage, and not then, except in regard to the note *specifically described.* He evidently took the security upon a random note given by Darrow, because it was all he could get in a scramble.

III. But when this case is viewed in connection with the case of *Gibson* v. *Seymour,* already referred to, where it is distinctly announced by Chief Justice WILLIAMS, in the opinion of the court, that an absolute deed intended as a security for future indorsements, to be made by the grantor for the benefit of the grantee, is a valid security against all the world, it seems impossible to doubt in regard to the result to which we should come. We have shown, we think, very satisfactorily, that the condition in this mortgage did describe the indemnity in a general way, and clearly indicates its existence, and where it might be found. But at all events it could not surely be claimed, that it was more indefinite, or more exposed to the substitution of fictitious claims than if the entire condition had rested in parol without writing.

We conclude therefore, that it is impossible to distinguish fairly between the two classes of claims set up under this mortgage, both being described in a general way in the deed, and the requisite information readily attainable if sought in good faith, and in the proper manner; that it is impossible to reject either, in consistency with the well established rule of law deducible from the decided cases upon the subject, and that in this State the cases have really gone much further than it is necessary to go, in determining the present case in favor of the orators.

We might add that the present case is not one where any loss has been sustained by the defendant Brainerd in consequence of the established rule of law upon the subject. We have no occasion then, in consequence of any supposed hardship of this case, to qualify the former decisions upon the subject. But when we

contemplate the consequences of rejecting the whole or a portion of the plaintiff's claims clearly secured by a mortgage lien upon the land in controversy, in conformity with the well established decisions of the State for a quarter of a century, we feel the injustice of any attempt to qualify such decisions, and we might say farther, that if no such decision had been made by this court, it seems to us we could scarcely have a case where reason and justice more loudly called for the promulgation of such a rule, than the one now in judgment.

The decree of the chancellor is affirmed, and the case remanded to the court of chancery to carry the same into effect.

POLAND, J., dissenting. This case was argued at the stated term, in Franklin County, before the Chief Justice, Judges BENNETT, PIERPOINT, and myself, and all except me were of opinion that the decree of the chancellor should be affirmed. The question involved was considered one of so much practical consequence, that it was deemed advisable to have the case lie to the general term for further examination and consultation with the other members of the court. In the mean time, the opinion of the majority of the judges who heard the case was drawn up by the Chief Justice, as now delivered, but an examination of the same, and the consideration I have been able to give the case since the argument, have both failed to convince me of the correctness of the chancellor's decree, so far as the same allows the orator to recover for any advances made by him to Darrow after the execution of his mortgage. Since the argument, however, I have not had access to the papers furnished to the court in the case, until this term, and therefore have had no opportunity to draw up the reasons of my dissent in form. They must, therefore, be stated in a very general and brief manner.

My great objection to the doctrine of this decision is, that it is, in my opinion, another step in advance in frittering away and destroying the benefits and advantages of our system of registry. The great object of that system is, that there shall be a public record open to the inspection of all, where every person can ascertain by inspection and reasonable diligence the state of the title of all real property, and whether the same is subject to incum-

brances, and if so, their extent; a place where purchasers can acquire reliable information, and where creditors may ascertain the condition of their debtor's real property without endangering him, or themselves, by setting on foot inquiries and speculations as to the state of his affairs.

When this system was first adopted, it was made a serious question whether actual notice of a prior unrecorded conveyance would defeat the title of a subsequent purchaser or attaching creditor, but it was finally held, and no doubt correctly, that such notice, *in fact*, answered the object of a record, and that any after title obtained with knowledge of it, was a fraud upon the first purchaser.   Since then, various decisions have been made, which by slow but insidious steps have been gradually undermining the whole substantial advantage of the system.   This has generally been done by sustaining mortgages or incumbrances where the real nature and extent of them did not appear upon the record.   This evil has been felt to such an extent that in several of the States they have interfered by statute, and swept away all these various exceptions and judicial interpolations, and made fraudulent and void all incumbrances, which do not disclose upon their face their true character and extent.   I anticipate the same course of legislation in this State.

The subsequent claims of the orator were allowed under this condition in his mortgage; that said Darrow shall pay or cause to be paid, "all the notes and agreements I now owe or have with him, or I and others jointly and severally have with him."

In my judgment, these words do not, in terms, or by any just inference or interpretation, point to any future indebtedness or liability that should arise or accrue thereafter, but only to liabilities which then existed in some form or other, and that no man of mere common sense and reason would suspect from the mere inspection of the record, that the mortgage was intended to cover future advances, and that therefore the record of such mortgage would not, in any legal or equitable sense, put him on inquiry to ascertain whether such advances had been made, or their extent.

This mortgage was made in February, 1851.   The subsequent mortgage to the defendant Brainerd was not given till January, 1854.

All the evidence in the case shows that Darrow was an active, stirring, trafficking, business man, and Brainerd might reasonably suppose that whatever indebtedness, or notes, or agreements the orator held at the date of his mortgage, had been paid and cancelled at the time he took his mortgage, and that he incurred very little risk from any debts of that early date.

It is not claimed that this part of the mortgage condition did or could afford the slightest information of what was intended to be secured by it, but it is said that because it did not, and from its very uncertainty and vagueness, it put Brainerd and all others who might have an interest in ascertaining the extent of the incumbrance, *upon inquiry*. Conceding this to be so, and that Brainerd was thus put upon inquiry, what was his duty, and to what extent was he affected? As I understand the law on this subject, when a man has no certain knowledge of a fact, but is only *put on inquiry*, he is held to have notice of all such facts as reasonable diligence in prosecuting his inquiry in the proper direction would bring to his knowledge. What was Brainerd bound to do? what did he do? and what did he learn? Brainerd had a large debt against Darrow, and desired to get security. Darrow was evidently on the eve of failure, or rather had failed, and what was to be done must be done quickly. The persons most likely to know what was meant by this condition, and how much, if anything, was due under it, were the orator and Darrow. The orator was absent in a distant State, and it is not claimed that he should or could have been consulted. Brainerd did apply to Darrow, and was informed by him that there was nothing due, that the orator was fully paid, and Darrow repeated this many times after the records had been examined, and after being apparently pressed in the strongest manner both by Brainerd and Hoyt. The only other source of information that appeared to be open at all, was to make inquiry of the orator's father, and this was made by Mr. Hoyt, at the request of Brainerd, and no question is made but that Hoyt was a perfectly competent man for that purpose, and learned all the facts that could be learned in that quarter. The result of Hoyt's examination was, that he discovered no trace whatever among the orator's papers of this conditional note, or

the debts allowed to the orator under it, and this information was communicated to Brainerd while Darrow was still there and while there was some opportunity, at least, for Brainerd to have obtained further security from him, at least by arresting his body, and it appears he absconded the same night, carrying away a. considerable sum of money.

Now it is clear to my mind that Brainerd used all possible diligence to ascertain the state of Darrow's indebtedness to the orator under this mortgage, and did not discover the slightest trace of any debt which the orator claims to recover, which accrued subsequent to the date of his mortgage.   With what propriety then can it be said, that he is to be held affected with any knowledge of what the record itself did not disclose ?   It is said that if the orator had been at home,, and had been inquired of, he could have given him full information, and that the orator was not bound to remain at home to. give it, or refrain from taking long and distant journeys.   All this is very true, but a most satisfactory answer to all this is, that it was his duty to have his mortgage so describe his debt that other persons could learn by the record the state of his incumbrance, and thus run as little risk by his absence from home as he did himself.

It is hardly possible to suppose a case which will better illustrate the advantages and safety of a rigid adherence to the integrity of our recording system, and the dangers and insecurities of departing from it, than the present case.   But it seems to me that this condition of this mortgage is invalid to entitle the orator to hold under it for any future advances.   The cases on this subject seem to require, to make it available for any such purpose, that the mortgage should clearly express on its face that it is given to secure future advances, or if a bond or note be given which is to be a security for future advances, the mortgage must describe that, and the advances not exceed it.   I think no case can be found where one or the other of these has not been required.   Where a mortgage is given expressly to secure future advances, or as an indemnity, express notice is thereby given to all the world that they must inquire; and when a mortgage is given for a specific sum which is intended as a security for future

advances, the record always shows on its face an absolute incumbrance, for at least as much as it is in fact, and nobody can be deceived by the record.

The condition of the orator's mortgage was invalid under these decisions, for it complied with neither requirement; it described no debt and no sum, and did not point to future advances.

Neither of the cases cited, decided in this State, conflict at all with this view. In *Gibson* v. *Seymour*, where it was held that an absolute deed given to secure a debt, and for future advances, was void as a mortgage, the record showed the whole title to be in the mortgagee, and no title at all left in the mortgagor, so that no one, from the record, could be deceived by supposing he had a greater interest or title than he had in fact.

So in *McDaniels* v. *Colvin*, the court held that the language of the condition expressly pointed to future advances or indebtedness, so as to come entirely within the cases in other States. I think previous decisions in this State and other States have gone to a dangerous extent, but I regard this decision as an advance upon them all, and in the wrong direction.

There does not seem in the present case to have been the slightest necessity for the orator to have his mortgage in this deceptive form. His conditional note existed long prior to the execution of his mortgage, the mortgage was executed under no circumstances of haste, but was made as it was, deliberately, and I have no doubt done so purposely, so as not to have it show on its face the true indebtedness of Darrow to the orator, and for the purpose of giving a false appearance of credit to Darrow to deceive his creditors, and persons of whom he desired to obtain credit, and its designed and legitimate purpose and end has been accomplished. In my opinion it should be held fraudulent and void. Agreeably to the purpose for which the case was held to the general term, the papers and briefs have been examined by Judge BARRETT, who fully concurs, I am authorized to say, in the views I have expressed. Judge ALDIS having been of counsel for the defendants, is disqualified to sit in the case. I regret that the case should be thus decided by a less number than a majority of the whole court, but it seems a necessary result, being the opinion of a majority who can act in the case.