## Curtis Emerson v. Samuel T. Atwater and Others.

Where an erroneous principle has been established by the judicial decisions of the state, and individuals acting upon it as settled law have acquired rights under it, this court, after the lapse of many years, will hesitate long before over-ruling it, believing it to be better and safer to leave it to the Legislature to correct the error, as in that case all intervening rights would be saved, and injustice done to no one.

A deed, absolute on its face, given by a debtor to his creditor, may, in equity, be shown by parol to have been given to secure the payment of the debt; and when that fact appears, it will be held to be only a mortgage.

Where a debtor, owning lands encumbered by mortgages, gave his creditor a deed of the lands, on a parol understanding that the creditor was to dispose of them for the payment of the mortgages, and his debt, and account to the debtor for the balance, and the creditor, instead of paying off the mortgages, bought them, as agent for and in the name of a third person who claimed not to be aware of this understanding: — *Held*, That the latter could not claim to be a *bona fide* purchaser without notice of the debtor's equities, but must be held in law charge-able with knowledge of the facts of which his agent was cognizant.

Such purchaser of the mortgages, holding them subject to the debtor's equities, can not cut off those equities by selling the land mortgaged, under the power of sale, and bidding it in himself.

A plea that defendant is *bona fide* purchaser and owner of the absolute title to lands, is not sustained by proof showing that he is owner of a mortgage inter-est only.

Where one defendant answers, and the other interposes a plea which is put in is-sue, and the defendant answering is examined as a witness for his co-defend-ant, his testimony must be restricted to matters, in proof of the plea, in which he is not himself interested.

It is the interest of the party in the subject matter to which he is examined, and not the effect his evidence may have in the final determination of the is-sue, that renders him incompetent.

*Heard May 4th, 5th, 6th, 10th, 11th, and 12th. Decided July 12th.*

Appeal in chancery from Saginaw Circuit, where decree was given for complainant.

The pleadings and testimony in the case are so fully stated in the opinion, that it is deemed unnecessary to give any further abstract of them.

*M. Wisner*, and *C. I. Walker*, for complainant:

1. The plea of defendant Green is not sustained by his evidence. His plea is of a *bona fide* purchase at the

mortgage sales, for money paid down;-and the proof is of the premises being struck off to him on the foreclosure of mortgages standing in his name, and without any payment whatever by him at the time. This defence must therefore fail. He can not change his position, and set up any other purchase, at any other time, or this purchase for any other consideration, or that these deeds were made to him as security. — 14 *Johns.* 501; 1 *Cow.* 711; 10 *Wheat.* 181; 9 *Pet.* 405; 3 *Sandf. Ch.* 305; 10 *Pet.* 177.

2. The defendant Green was not a purchaser without notice.

Emerson is shown by the evidence to have been in possession of the premises at the time; and such possession is implied notice of the rights, whether equitable or legal, of the occupant, although no actual notice is proved — 16 *Ves.* 249; 2 *My. & K.* 629; 5 *Johns.* 29; 2 *Paige,* 300; 4 *Blackf.* 383; 8 *Greenl.* 94; 13 *Ohio,* 408; 2 *J. J Marsh.* 435; 1 *Litt.* 351; 7 *Watts,* 384; 2 *Hill Ch.* 428.

But if there was any doubt upon this point, we prove, beyond all question, that, when Green received the deeds upon which he plants himself in his plea, he received them through the agency of Atwater, who was fully cognizant of all the facts.

When acting, therefore, as the agent of Green, he had full notice of our equities; and notice to the agent is notice to the principal. — 2 *Vern.* 574; 3 *Atk.* 646; 1 *Keen,* 154; 3 *Russ.* 493, *note* 1; 1 *Hoff. Ch.* 153; 9 *Paige,* 319; 4 *McLean,* 93; 27 *Ala.* 345.

3. Parol evidence is admissible to show that a deed absolute upon its face was intended as a mortgage, not only where the defeasance was omitted by fraud, accident, or mistake, but where it was omitted by design, on mutual confidence; and where the fact is established by such proof, it will be held as a mortgage. — 4 *Kent Com.* (143) 146; 4 *Johns. Ch.* 167; 6 *Ibid.* 417; 1 *Paige,* 77; 5 *Ibid.* 10; 6 *Ibid.* 480; 8 *Ibid.* 238; 36 *Me.* 123; 6 *Humph.* 99;

2 *Sum.* 233; 3 *Story,* 290; 1 *Hoff. Ch.* 31; 1 *How.* 125; 12 *Ibid.* 147; 19 *Ibid.* 300; *Harr. Ch.* 113; 2 *Lead. Cases. in Eq. Part* 1, 533; 2 *Lead. Cases in Eq. Part* 2, 436; 16 *N. Y.* 341; 5 *McLean,* 282; 26 *Ala.* 312; 29 *Ibid.* 261; 21 *Mo.* 325; 1 *Wis.* 527; 2 *Curt.* 386; 6 *Watts,* 130.

The fact that the grantee was to have the power to sell, to pay off indebtedness, does not affect the question, or alter the nature of the transaction. — *Ibid.*; 3 *Pick.* 490.

There is a striking similarity between the case cited from 19 *Howard,* and the case at bar, as well in the facts as. in the legal principles involved.

The case of *Fuller v. Parish,* 3 *Mich.* 211, goes much further than we contend for, and may not be law since the. case of *Adair v. Adair,* 5 *Mich.* 204; but the latter case. does not conflict with our position.

We are also clearly entitled to a decree for a specific. performance of the contract of Atwater, set up in the bill, and fully proved, on the ground of part performance. — *Lead. Cas. in Eq.* (507) 557, 567.

*G. C. Bates,* and *J. Moore,* on same side.

*S. T. Douglass,* for defendant Green:

1. Upon the bill, the conveyance from Emerson to. Atwater was a conveyance upon *express trusts* — that is, trusts created by express declaration or agreement, and not a conveyance upon *implied trusts* which arise by construction of law, or by "*act or operation of law*" upon the acts or situation of the parties.— *Willard Eq.* 416; *Hill on Trust.* 91, 114; 1 *Spence Eq.* 508; *Browne on Stat. Fr. Ch. VI.* As the bill makes a simple case of a conveyance upon express trusts, without alleging any facts out of which implied trusts could arise, evidence is inadmissible under it to make a case of implied trusts. — 1 *Bro. Ch. Cas.* 93; 5 *Ga.* 589, 598, 623; 3 *R. I.* 237; 6 *Barb.* 107; 2 *Wis.* 593.

2. Under our statute of frauds such an express trust could only be created "by deed or conveyance in writing, subscribed by the party creating or declaring the same."— 1 *Bro. Ch. Cas.* 92; 1 *Ves.* 241; 1 *H. Bl.* 659; 4 *Russ.* 423; 3 *P. Wms.* 618; 3 *Bro. Ch. Cas.* 577: 1 *Eden*, 515; 6 *Ves.* 332; 1 *Johns. Ch.* 339; 5 *Ibid.* 1; 6 *Barb.* 99; 13 *Mass.* 443; 5 *Cush.* 90; 2 *Ibid.* 232; 7 *Ind.* 308; 8 *Ibid.* 209; 2 *Green Ch.* 362; 2 *Wis.* 583; 3 *Ibid.* 576; 2 *Bibb.* 311; 9 *Dana*, 108; 5 *Ga.* 341; 6 *Ibid.* 591; 4 *W. & Serg.* 149; 5 *Ibid.* 427; 9 *Watts*, 32; 1 *Des.* 333; 32 *Me.* 34; 1 *Jones Eq.* 193; 2 *Ibid.* 259; *Ibid.* 184; *Busbee Eq.* 259. It is conceded that there are authorities which can not be reconciled with this position, and which treat cases like that now under consideration as cases of constructive trust arising out of fraud. But these cases seem to us to be a manifest departure from sound principle. To lay the foundation for such a trust, the fraud must be not simply that which is involved in every breach of contract, but there must have been an original misrepresentation, by means of which the legal title was obtained; an original intent to circumvent and get the better bargain by the confidence reposed. And when such a trust is sought to be enforced, the fraud should be distinctly alleged and clearly proved.— 1 *Sugd. on Vend.* 187; *Browne on Stat. Fr.* §§ 94 *to* 96, *and p.* 109, *n.* 3; 2 *Lead. Cas. in Eq. Pt.* 1 *pp.* 585 *to* 588; *Hill on Trust.* 166; 6 *Harr. & J.* 255; *Ibid.* 422; 1 *Rich. Eq.* 91; 2 *Ibid.* 162; 1 *Watts & S.* 372; 10 *Watts*, 313.

3. The conveyance to Atwater was not by way of mortgage merely. Upon the averments in the bill, it was a conveyance upon trust, and not a mortgage, in so far that it was a conveyance upon the terms that Atwater should take charge of the lands, and manage the same, and sell portions thereof, and out of the proceeds pay what was due upon the Blackmar and Eaton contract, take a title from them, and pay off the encumbrances upon the property.— 5 *Cush.* 90; 18 *How.* 143; 11 *Ohio*, 204; 17 *Ohio*,

482; 4 *W. & Serg.* 149; 6 *Ired.* 224; 6 *Barb.* 99; 4 *Russ.* 423. If the only object of the conveyance had been to enable Atwater to sell and pay off Emerson's indebtedness to him, Atwater could not have maintained a bill to fore-close the equity of redemption, as may always be done in the case of a mere mortgage. — 1 *Hare,* 533; 11 *Eng. L. & Eq.* 297. He could have maintained ejectment before foreclosure, which the statute forbids in case of a mort-gage. — 11 *Ohio,* 341. He could have conveyed the fee discharged of any equity of redemption in Emerson. — 3 *Kern,* 200.

Manifestly none of the objects and purposes of the con-veyance, as alleged in the bill, could have been accomplished, unless it were construed as a conveyance upon trusts, and not a mortgage; and the following cases, in addition to those already cited, show that such was its nature. — 2 *Ball & Be.* 279; 6 *McLean,* 340; 3 *Johns. Ch.* 442; 3 *Wis.* 576.

4. Assuming that the bill makes a case of conveyance by way of mortgage merely, and not upon express trusts, we maintain that a conveyance absolute on its face can not be turned into a mortgage, merely by averment and proof of a cotemporaneous parol agreement between the grantor and grantee. It is conceded that upon this point there is much conflict of authorities, but, (1): there is great weight of authority, as well as of reason, in sup-port of the proposition that a deed absolute on its face can in no case be shown to be a mortgage by parol evidence, *unless upon averment and proof that the defeasance has been omitted through fraud* (or oppression, which is tantamount to fraud), *ignorance, or mistake.* — 3 *Atk.* 389; 3 *Bro. Ch. Cas.* 92; 1 *Ves.* 241; 13 *Mass.* 447; 5 *Cush.* 90; 36 *Me.* 562; 7 *Greenl.* 435; 32 *Me.* 34; 2 *N. H.* 71; 5 *Lit-tell,* 74; 9 *Dana,* 108; 2 *Bibb,* 311; 1 *Des.* 340; *Ibid.* 337; 6 *Harr & J.* 128; *Ibid.* 435; 3 *Md. Ch. Dec.* 511; 1 *Jones' Eq.* 193; 7 *Ired. Eq.* 246; 6 *Ibid.* 283; 2 *Jones Eq.* 172, 209,

EMERSON v. ATWATER.

256; 6 *Ired. Eq.* 38: 1 *Ired. Eq.* 290; 2 *Ired. Eq.* 560; 7 *Ired. Eq.* 13, 167; 6 *Hill,* 27; 6 *Barb.* 105; 16 *Barb.* 439. (2) There is another view of this subject, which is sustained by a considerable weight of authority and plausibility of reasoning. It is substantially this: 'Every conveyance of land which is in fact a security for a debt, whatever may be its form, is, in contemplation of equity, a mortgage. Whether a deed is to be regarded as an absolute conveyance, or a mortgage, depends upon the circumstances under which it was made, and the relations existing between the parties, and not exclusively, or even chiefly, upon the agreement. "Hence the nature of those *circumstances and relations* may be shown by parol evidence; not for the purpose of contradicting the deed, but of raising an equity paramount to its terms. The fact to be established, to convert an absolute conveyance into a mortgage, is that the consideration of the conveyance was a *debt, which continued to subsist as such after the conveyance was executed;* and of course every collateral circumstance which tends to show that such was the nature of the consideration, may be proved by parol; such as the disparity between the consideration and the value of the land, possession continuing in the grantor after the conveyance, the demand of interest by the grantee, &c. The admission of parol evidence of facts and circumstances, of a nature to overrule the agreement of the parties, is deemed to be perfectly consistent with the statute of frauds, and to rest upon the same principle upon which parol evidence was formerly admitted to prove a resulting trust, by proving the source of the consideration. — See *Leading Cas. in Eq. Vol.* 2 *pt.* 2, *pp.* 430 *to* 436; *Pt.* 1, *pp.* 562, 564, 585, 588; *Vol.* 1, *p.* 176. (3) A third class of decisions assert, in the broadest and most unqualified terms, the admissibility of parol evidence to prove a deed a mortgage, without making any distinction between evidence of facts and circumstances, and evidence of a cotemporaneous parol agreement. We submit

that the first of these three classes of decisions lays down the true doctrine on this vexed and difficult subject, and the only doctrine entirely consistent with the statute of frauds and the general rules of evidence.

5. But all the cases agree that there is a strong presumption that every written instrument expresses the real intentions of the parties — a presumption so strong as to be generally indisputable, except upon proof of fraud, accident or mistake, and which can not be overcome in any case, except upon the strongest and most irrefragible evidence. — 1 *Bro. Ch. Cas.* 341; 6 *Ves.* 334; 1 *Hoff. R.* 90; 1 *Lead. Cas. Eq.* 169; 1 *Story Eq. Juris.* § 157; 1 *Bibb*, 609; 2 *Ired. Eq.* 160; 2 *Lead. Cas. Eq. pt.* 2, 436. And that an absolute deed ought never to be converted into a mortgage, upon mere proof of the admissions and declarations of the grantee — the weakest, most easily fabricated, and most dangerous of all kinds of evidence. — 1 *Johns. Ch.* 599; 2 *Blackf.* 101; 1 *Bibb.* 609; 4 *Blackf.* 67; 13 *Ala.* 252; 2 *Ired. Eq.* 560; 4 *Ired. Eq.* 325; 5 *Ga.* 341; *Busb. Eq.* 52; *Ibid.* 272; 6 *Ired. Eq.* 283; 2 *Jones Eq.* 256; 21 *Ala.* 105.

*H. H. Emmons, W. Gray* and *W. L. Webber* on same side.

MANNING J. :

The bill in this case is filed to enforce certain alleged equities, which complainant claims to have, in one hundred and eighty-one acres of land, and the proceeds thereof, conveyed by complainant to defendant Atwater on the 27th day of May, 1853.

The conveyance is absolute on its face. The bill states there were three several mortgages on the land at the time it was conveyed to Atwater; one to Charles W. Rockwell and John A. Rockwell, for $5,161.70, dated 19th February, 1847, and another of the same date to William L. P. Little, for $1,338.30; and a third to Daniel L. C. Eaton and Abel

T. Blackmar, for $1,237.97, given on the 4th March, 1851: That complainant, being embarrassed in his pecuniary circumstances, was unable to pay said mortgages, and that a bill was filed in 1851, in the U. S. Circuit Court for the District of Michigan, to foreclose the Rockwell mortgage, on which the usual decree for a sale had been obtained:

·That on the 16th October, 1851, Eaton and Blackmar commenced foreclosing their mortgage, by advertisement; and that, on the 8th January, 1852, the premises were sold and bid in by them, subject to complainant's right to redeem in one year thereafter: That complainant was unable to redeem within the year, and that Eaton and Blackmar had their deed recorded, and claimed possession of the land: Complainant insisted they had not advertised according to law, and that the sale was therefore void, and on the 22d March, 1853, the matter was compromised by complainant quit-claiming the lands to them, and they covenanting, at any time before the 1st October following, to· re-convey them to complainant on his paying the sum they had been bid off at, with interest, and that complainant should have possession in the meantime.

The bill then states, that on the 27th May, 1853, complainant being unable to raise money to pay off said incumbrances and other liabilities of complainant, Atwater offered to negotiate for, and to raise the money to pay off such liabilities, if complainant would convey to him said lands, so that he, the said Atwater, could have the control of said lands; and then and there agreed that in case complainant would so convey to him said lands, he would take charge thereof, and manage the same; that he would make sale of the whole or such part of said lands as should be necessary to pay off said liabilities of complainant, viz.; the several sums due upon said several mortgages, and the amount due from complainant to Atwater; and that, after paying said sums, he, Atwater, would re-convey such portion of said lands as should be remaining in his hands

unsold; or, in the event of a sale of the whole of said lands, that he would pay over to complainant any surplus of money in his hands, after paying the amount that should be due upon said three mortgages and the amount due from complainant to himself; and said Atwater further agreed with complainant, that if complainant should, at any time, pay the amount due on said mortgages, and the amount due to said Atwater, that he, Atwater, would reconvey said lands to complainant: and it was understood, and expressly agreed, that ¡Atwater should hold the lands upon the terms, for the purposes, and upon the conditions stated, and not in fee ; but only as security for the purposes aforesaid; and that in pursuance of said agreement the deed was executed and delivered to Atwater.

The bill further states that, on the 12th June following, defendants Atwater and Durfee "purchased of complainant that part of said lands known and designated as the "Steam-mill Reserve," with mill thereon, and containing about six acres of land, for the price and sum of sixteen thousand dollars, to be applied towards the liquidation of the aforesaid indebtedness of complainant; and that, on the 17th day of the same month, complainant sold and delivered to Atwater a large quantity of pine logs, and other personal property, for $7,560.95, which sum was also to be applied towards discharging said liabilities:

That Atwater represented to complainant that, in order to make the title perfect, it would be best for him to buy in the claim of Eaton and Blackmar, and to take an assignment of the other two mortgages, and foreclose the same, and bid in the land: that on such representation complainant consented to that course: that afterwards, Atwater procured a transfer of the interest of Eaton and Blackmar in the lands to defendant Green, and procured assignments to be made of the other mortgages to Green, and foreclosed said mortgages, and at the sale bid in the premises in the name of Green:

That this was done for the convenience of Atwater: that Green had full knowledge of the rights of complainant; and that he holds the lands in trust, subject to the order and disposal of Atwater, and the rights of complainant.

The bill also states, that Atwater and Durfee took possession of the "Steam-mill Reserve," with the mill and buildings thereon, and that they have taken other portions of the land at prices agreed on between them and complainant, &c.: that other parcels have been sold by Atwater, and that complainant has made payments to Atwater in notes and demands, &c.,: that the greater part of the land has been laid out and platted, and is now known as a part of the City of East Saginaw: charges that the claims and demands for which the lands are held by Atwater as security, are paid, and prays an account, and a re-conveyance of the lands unsold.

The bill waives an answer under oath, and is taken as confessed against Durfee.

Atwater put in an answer, stating that complainant was owing him $30,000, for advances that had been made by him to complainant; that he was insolvent, and that he proposed to, and did, execute and deliver to him, Atwater, the said deed of conveyance in fee simple, in consideration of the said debt, subject to the incumbrances mentioned in the bill of complaint; and that said deed of conveyance was executed and delivered absolutely, without any condition, trust or agreement whatever, either express or implied; and that at the time of said conveyance, his said debt, together with said incumbrances, far exceeded the value of said lands: that, at the time of the execution and delivery of the deed, he held a mortgage on the premises for the first accruing part of his demand, amounting to $8,200, executed to him by complainant, November 1st, 1850; that said mortgage moneys were wholly unpaid; as well as the balance of the $30,000; and that the deed of

conveyance was executed and delivered to him by complainant in lieu of, and as a substitute for, the foreclosure of said mortgage, and to release complainants' equity of redemption in the land. And each and every other material allegation in the bill of complaint is denied.

Green filed a plea, stating that he purchased the premises on the statutory foreclosures of the Little and Rockwell mortgages, for a valuable consideration paid by him, and without notice of complainant's equities.

The cause was put at issue, and proofs were taken, and on a hearing in the circuit court a decree was made in favor of complainant, and the case is now before us for review on appeal.

It is objected to the relief given complainant in the court below, that the case made by the bill is one of express trust; and that by statute (*Comp. L. p.* 942 §3177), an express trust can be created by a deed or conveyance in writing only.

It is also objected that, if the case shows an absolute conveyance, but intended by the parties as a security or mortgage only, the deed, being absolute on its face, can not be turned into a mortgage by parol proof, or by proof of a cotemporaneous parol agreement.

The bill makes a case of conveyance in the nature of a mortgage, with power to Atwater to sell a part or the whole of the premises, to pay the incumbrances, and what Emerson was owing him; reserving the surplus, if any, to Emerson. This view does not wholly extricate the case from the first objection, if there be any force in that objection; for the statute that requires express trusts to be created by deed or conveyance in writing, includes powers "over or concerning lands," as well as express trusts.

In *Wadsworth v. Loranger* (*Har. Ch.* 113), Chancellor Farnsworth says: "That a deed absolute in its terms may be proved by parol to have been intended by the parties to operate only as a mortgage, can not admit of a

doubt;" referring to *Strong v. Stewart*, 4 *Johns. Ch.* 167; *James v. Johnson*, 6 *Johns. Ch.* 417, and *Van Buren v. Olmstead*, 5 *Paige* 9. In that case there was a parol cotemporary agreement; as in the case before us.

In *Fuller v. Parish* (3 *Mich.* 211) parol evidence was admitted to show a bill of sale, absolute on its face, was intended by the parties to be a mortgage. That was a case at law, and it was admitted by the plaintiff in error that such evidence would be competent in a court of equity. Green P. J., in giving the opinion of the court, says: "It is conceded on the part of the plaintiff in error, that in a court of equity, it would be entirely competent to show, by parol proof, that a deed absolute on its face was intended as a mortgage, and that *then* effect would be given to it according to the true intent of the parties. This has been too long and too well settled, and too distinctly recognized by our own courts, to admit of any question" (*p.* 213). And in *Swetland v. Swetland* (3 *Mich.* 482), it seems to be taken for granted as the law, both by counsel and court. Wing J. says: "if it appeared the debt due from Eli to William was not extinguished by the delivery of the deed to William, or that the deed was made for the purpose of securing the payment of a debt, it would be our duty to declare it to be a mortgage" (*p.* 487).

We refer to these cases to show the general understanding of the bench and bar on this subject, and the injustice that would be done by overruling, at this late day, the case of *Wadsworth v. Loranger*, to those who may have looked to that case for the law, and have acquired rights under the law as there laid down. This consideration, of itself, if we believe that case to be erroneous in principle, which we do not, would cause us to hesitate long before overruling it, believing it would be both better and safer to leave it to the legislature to correct the error, than to undertake it ourselves, as all intervening

rights would, in that case, be saved, and injustice be done to no one.

The principle on which courts of equity proceed in this class of cases, is not that it is in contemplation of law a fraud for A, who has made a parol agreement to sell B a piece of land, to refuse to deed the land, or to live up to his parol agreement. It would be as clear a violation of the statute of frauds in a court of equity to decree a specific performance of such contract, as it would in a court of law to sustain an action on it for damages. It is upon no supposed fraud of this kind that equity bases its action. It proceeds on a different principle, viz; the relation between the parties of debtor and creditor, or borrower and lender, and the abuse of that relation. The statute of frauds was intended for persons dealing with each other at arm's length, and on an equal footing; and even then, when the contract has subsequently been in part performed by one party, with the assent of the other, equity will compel the latter to perform on his part, as it would be a fraud on the statute for a party to invoke its protection under such circumstances.

Courts of equity frequently set aside deeds and other contracts between trustee and *cestui que trust*, attorney and client, guardian and ward, and parent and child, and other like cases, when it has reason for believing the relation between the parties has been abused, when such deed or contract, had it been between parties not so related, would have been held good. The principle the court goes on in cases of debtor and creditor, is the same as in the cases we have just mentioned. The difference is in its application only. In these last cases it is to prevent the abuse of a confidence which the relation implies. In the case of debtor and creditor, the abuse of the power of coercion which a creditor sometimes, by the force of circumstances, has over the debtor. So sensible are courts of the existence of this power, and of its abuse, and that debtor and creditor do not

at all times stand on an equal footing, that the borrower, says Judge Story, "has been significantly called the slave of the lender."—(1 *Story's Eq. Juris.* §302.) And Judge Green, in *Fuller v. Parish*, says : "Mortgages, and conveyances intended to operate as mortgages, are generally given by the necessitous to the more opulent, the debtor to the creditor, the borrower to the lender, the suppliant for power to him who has power to make the terms upon which it shall be granted. The man whose .property is about to be sacrificed by a creditor, will not hesitate in regard to the amount of security to be given, nor the manner of giving it, if he can loan the money to satisfy the debt, or otherwise gain time for its payment. He will not hesitate to execute a deed, or bill of sale, absolute upon. the face of it, but intended to operate as a mortgage, to four times the value of the loan, without insisting upon a written deed of defeasance."— (3 *Mich.* 217).

 Courts of equity have, from an early day, interfered between creditor and debtor to prevent oppression. What is now a mortgage, was at common law, and until courts of equity interfered, a conditional conveyance of land, that became absolute on the non-performance of the condition by the grantor on or before the day mentioned in the deed. The penalty of a bond was collectable at law, until equity restrained its collection, on the payment of what was due on the condition. When the relation is mortgagor and mortgagee, once a mortgage always a mortgage, is the maxim in equity. — See *Leading Cas. in Eq.* Vol. 2, *pt.* 2, *p.* 432, where may be found a large collection of cases in which deeds have been declared to be mortgages.

Honesty and fair dealing, and the good of society, require that the cupidity of man should be kept within certain limits, and not be allowed to roam at large. To define and fix these limits, and give relief when they are transcended, has ever been the province of courts of equity, and their chief excellence consists in a wise and judicious exer-

cise of this part of their jurisdiction. Neither the statute of frauds, nor the statute requiring powers and trusts to be created in writing, is, we think, encroached on, by a court of equity exercising its jurisdiction in this class of cases, as it was wont to do before these statutes were passed. A different construction of the statutes would make them what they were never intended to be, a shield for the protection of oppression and fraud.

The evidence clearly shows the deed was given to enable Atwater to sell the property, and, after paying the incumbrances, to pay himself what Emerson was owing him.

Atwater, in his answer, says, Emerson was owing him $30,000, for advances that he had made to him; and that he was insolvent. Of this sum, $8,200 were secured by a mortgage on the premises, given on 1st November, 1850. This mortgage, though given before, was recorded after the Eaton and Blackmar mortgage, and stood as the last incumbrance on the property.

Emerson and Atwater were brothers-in-law, and the property consisted of one hundred and eighty-one acres of land adjoining the city of East Saginaw. Its value was, in a great measure, speculative, and depended on the future growth of the city, and the use that might be made of it in platting and selling it for city purposes. Three of the witnesses, Little, Andre, and Glasby, in speaking of its value in May, 1853, estimate it as worth, at that time, from thirty to seventy thousand dollars. Mr. Little says, the valuation he " should put upon it, at that time, would be from thirty to forty thousand dollars; that was before we had got very much inflated." The other two witnesses value it much higher. And from two other witnesses, it would seem Mr. Atwater himself valued it at $100,000 or more, in 1854. The value of property under such circumstances, is so uncertain and difficult to be got at, depending, as it always must, more on the future than the present, that no great importance should be attached to this testimony. It is referred to, as the parties

may have been, and probably were, influenced in what they did, more or less by this speculative value; and consequently, there is nothing in the circumstances of the case rendering it improbable that the transaction was what it is represented to have been in the bill of complaint. An embarrassed man would not be very likely to voluntarily release his hold on what he looked upon as a fortune. Nor is there anything improbable in a relative coming to his rescue in such a crisis.

We have not the testimony of any witness who was present when the deed was executed. Nor is there any evidence of a settlement between the parties at the time, or of the amount Emerson was then owing Atwater, or of the discharge of Emerson's indebtedness by Atwater. Their past transactions, for ought that appears, remained in the same condition after the deed was executed that they were in before.

Ashman, who was Emerson's book-keeper at the time says he was present at several conversations between the parties, about the time the deed was executed, and that he understood from such conversations, that the property was to be made over "to Atwater in trust, and the proceeds thereof applied as follows: First, to pay off all incumbrances existing on the property; Second, to pay off the indebtedness that was claimed to be due to Atwater from the complainant, and the balance, if any, was to be refunded to complainant." He further says, he "distinctly understood that the conveyance, although absolute on its face, was intended to be a mere trust, for the purpose of discharging certain pressing incumbrances, and to secure Atwater for moneys claimed to be due to him from Emerson." He repeats the same thing in substance, but in somewhat different language, in other parts of his testimony. While Atwater was at Saginaw at this time, and it appears from the testimony he was not there over a week. Norman Little had a conversation with him regarding the

property. He stated to Little, "that he had made large advances to Emerson, and his object in taking a conveyance of the property was, that he might secure himself, and manage it to better advantage for Mr. Emerson; that he did not want to make anything out of it himself." To W. L. P. Little, he said in 1854, "I have only got this property in possession to prevent its being sacrificed; and when I get what I have advanced to Mr. Emerson, and what I am liable for him, he will have the property again." He stated, at different times, and on different occasions, to Lyon, Richmond, Nugent, Minnick, Andre, Bullock, Richardson, and Whitney, that after he had got out of the property enough to pay the incumbrances and himself, the balance of the property would belong to Emerson, — or language to that effect.

Durfee and Atwater were partners, and resided in Buffalo, in 1853. Soon after Atwater returned to Buffalo, he sent a Mr. Dorr, who was in his employ at the time, to Saginaw, to take charge of the mill property. By Dorr he sent two letters to Emerson, both written by himself, one in the name of the firm, and the other in his own name. In the first, he stated Dorr was the authorized agent of Durfee & Atwater to take charge of the mill property, comprising six acres of land, &c. His individual letter to Emerson commenced as follows: "I have made an arrangement with Mr. Durfee to go in with me in the purchase of the mill and six acres, including the houses, buildings, docks, shops, logs, &c., belonging to the same, for $16,000; the logs to be paid for at cost. Mr. Dorr goes up to take possession," &c. Near the close of the letter, he uses the following language: "I think the arrangement a good one, and if no hindrance is put in the way of its completion, we shall soon have the balance of the property in a way of being sold in lots as may be required." The language of this letter is deserving of notice. It is, "I have made an arrangement with Mr.

EMERSON v. ATWATER.

Durfee, to go in with me in the purchase," &c. Not to sell him an undivided half of the mill property, but to go in with me in the purchase of it. Again, "I think the arrangement a good one, and if no hindrance is put in the way of its completion," &c. What reason had he to suppose any hindrance would be put in the way of its completion? Was it that Emerson might be dissatisfied with the price? And was it to obviate such objection the sentence was made to close, "we shall soon have the balance of the property in a way of being sold in lots, as may be required." In the winter of 1854, Ashman says, the mill and six acres were valued by him and Atwater at $18,000. Richardson says, Atwater told him in the fall of 1853, that he had purchased the old mill and six acres. And in a conversation with Nugent, in March, 1854, he spoke of the price he had paid for the old saw mill. Ashman, also mentions the sale of the saw mill and six acres in his testimony.

It further appears, from Ashman's testimony, that in the spring of 1854 Atwater agreed to take of Emerson twenty-one water lots, at $250 a lot, and to give him credit for them. Nugent says he was present when Atwater selected the lots. He does not remember the number of lots — thinks there were from twelve to fourteen. Minnick testifies that he "heard Atwater say he had bought twenty-one water lots of Emerson, and was going to put up a saw mill," &c. Atwater also spoke of this purchase to Richardson, in a conversation between them. These are the lots on which the new saw mill, grist mill, and warehouse were afterwards built.

Without going further into the testimony on this part of the case, we think it is proved beyond a reasonable doubt, that the deed of the 27th May was not intended by the parties, at the time it was given, to be an absolute conveyance.

Green's defence rests on the truth of his plea. He

claims to be a *bona fide* purchaser, without notice of com-
plainant's equities, under two deeds executed to him by
the deputy sheriff of Saginaw county, on the statutory fore-
closures of the Rockwell and Little mortgages.

Green was not at the sale. Atwater appeared, and either
he or Moore & Pennoyer, who foreclosed the mortgages,
bid off the property in his name. No money was paid at
the time by any one. The mortgages were foreclosed in
Green's name, and he claims to be a *bona fide* purchaser,
without notice, from himself; for the 'sale was his, though
made by an officer. If he was a *bona fide* purchaser of
the mortgages without notice, and thereby acquired an in-
terest in the land *pro tanto*, he could not increase that
interest by foreclosing the mortgages, and becoming the
purchaser himself. Nor, under the circumstances disclosed
by the testimony, can he be considered a *bona fide* holder
of the mortgages without notice. It was Atwater's duty to
pay the mortgages. He did pay them, but instead of having
them discharged, he took assignments of them in the name
of Green. A decree of foreclosure had been obtained on
the Rockwell mortgage in the Circuit Court of the United
States, and the decree and mortgage belonged to the
Michigan Insurance Company. Atwater paid, in cash, and
in two promissory notes given by him to the Insurance
Company, indorsed by Green and one Palmer, what was
due on the mortgage and decree, and had them assigned
to Green. A similar process was gone through with in
paying the Little mortgage. He paid Little $383.66 cash,
and gave him his two promissory notes, indorsed by Green,
for the balance, and took an assignment of the mortgage
to Green. No one but Atwater was known in either trans-
action to the holder of the mortgages, and it was on his
request the assignment was made to Green. Nor did At-
water's agency, if he was acting for Green and not for
himself, stop here. He placed the mortgages in the hands
of Moore & Pennoyer to foreclose, and paid them for their

services. They knew no one but Atwater in the business, until the day of sale, when he produced a letter from Green to them. Were the mortgages Green's, or did he hold them for Atwater? If they were his, Atwater was his agent in procuring them, and he is chargeable, through Atwater, with notice of Emerson's equities.

If the mortgages were assigned to Green, and subsequently foreclosed, and the premises bid off in his name, in pursuance of an agreement between Atwater and Green, and to vest the title in Green, to indemnify him for past and future advancements and indorsements made by him for Atwater, or Durfee & Atwater—and this, we are inclined to think, is not far from the truth—instead of proving the plea, it disproves it, by showing that Green has a mortgage interest only in the land. Nay, more, it would seem to go further, and imply something vicious in the conveyance from Emerson to Atwater.

Green must have known of the conveyance from Emerson to Atwater. Why did he not take a deed from Atwater to himself, if the deed from Emerson to Atwater was what it purported to be on its face? There must have been some very good and cogent reason, one would think, for incurring the expenses of two foreclosures, and waiting some fifteen months and more, for a title through the Rockwell and Little mortgages, when it could as well as not be had at once from Atwater. Was it to get a title back of Emerson's title to Atwater? And, if so, why? Was Emerson's title to Atwater defective? It was subject to these mortgages, and to the Eaton & Blackmar mortgage that had been foreclosed at law, and which Emerson, by an agreement with them, still had a right to redeem when he conveyed to Atwater. On paying these incumbrances, Emerson's title was good. And before the Rockwell and Little mortgages were assigned to Green, Eaton & Blackmar had been paid by Atwater, and a conveyance of their interest in the land had been taken by him in his own name.

Instead of a deed from Atwater, the following measures were taken to vest the title to the land in Green: The payment of the, Rockwell and Little mortgages by Atwater, and the assignment of them, at his request, to Green, and their subsequent foreclosure in Green's name, and the purchase, in his name, of the premises on the foreclosure sale. Why an assignment and foreclosure of both mortgages? Because neither covered the whole premises. The Eaton & Blackmar mortgage, that had been paid by Atwater, was given after the Rockwell and Little mortgages, and Atwater's title from Eaton & Blackmar, as well as from Emerson, was cut off by the foreclosures of the Rockwell and Little mortgages. One Jennison, it appears, had a small interest in the property. This Atwater purchased, and afterwards quit-claimed to Green. But the question still recurs, why was so much pains taken to ignore Atwater's title from Emerson, and to get a title paramount to it? We have already stated that Atwater's deed from Emerson, though absolute on its face, was intended by the parties as security for what Emerson was owing Atwater, and to pay the incumbrances on the property. Was it to get rid of this feature in Atwater's title? If so, Green, as well as Atwater, must have been aware of the true character of the conveyance from Emerson to Atwater. On no other theory can we account for the assignments of the Rockwell and Little mortgages to Green, their subsequent foreclosure, and his deraignment of title through them.

It may be said it was done to perfect Emerson's title. The bill states Emerson consented to it on such a suggestion from Atwater. Was not Emerson's title, with the exception of the incumbrances, good? Nothing appears to the contrary. If not, how was it to bettered by the foreclosure of these mortgages? They were given by Emerson and one Eldridge, when they owned the premises together, and Eldridge had conveyed his interest to Emerson, or to

EMERSON *v.* ATWATER.

Atwater in trust for him, on the 6th June, 1849. A pur-chaser under a foreclosure of these mortgages could get no better title than the mortgagors had.

The objection to Atwater's testimony is sustained. He was examined as a witness for his co-defendant Green. His examination, instead of being confined to matters in which he was not interested, in proof of the plea, was extended to the whole case. This was wrong. It should have been restricted to the truth of the plea, which was the only issue between complainant and the defendant Green. So much of his testimony as relates to the plea, tends to show Green holds the property for advances to, and liabilities for, Atwa-ter, or Durfee & Atwater. The plea is of an absolute, and not a mortgage interest in the land, and is not sustained by his testimony. If it was of a character to be proved by his testimony, he would most clearly be interested, for it would take the property from Emerson to pay witness' own debts. As his evidence, without reference to the plea, shows his interest in the matter to which he was examined, it must be rejected, for it is the interest of the party in the subject mat-ter to which he is examined, and not the effect his evidence may have in the final determination of the issue, that renders him incompetent.

The Circuit Judge made a final decree without any reference to a commissioner, to take and state an account between the parties, or to inquire and report what part of the property had been sold, and what remained unsold, &c. We do not see how a final decree could be entered, understandingly, without such a reference, and a report thereon. For this cause the decree must be reversed, and an interlocutory decree be entered, declaring the deed from Emerson to Atwater of the 27th May, 1853, though abso-lute on its face, was intended by the parties to be, and is, in its nature, a mortgage, with power to Atwater to sell the whole or a part of the premises, to pay off the incumbrances and the debt Emerson was owing Atwater :

That Green is not a *bona fide* purchaser of the premises, and that he holds them subject to Emerson's equities, and must account for all sales and acts done by him touching the property, to the same extent Atwater would have to account had they been done by him.

And there must be a reference to a commissioner to take and state an account between complainant, on one side, and Atwater and Green on the other, charging complainant with what he was owing Atwater on the 27th May, 1853, with all advances, if any, since then made to complainant, and debts incurred by him to Atwater or Green, if any; with the several incumbrances on the property at the time it was conveyed, and the judgment of the Michigan Insurance Co. assigned to Green — said judgment to be discharged by Green; with the rent of the house and lot on the six acres occupied by complainant; and with such other just and equitable demands as should be allowed to Atwater and Green, or either of them: And crediting complainant with the sale of the old mill and six acres of land, at $16,000; with the twenty-one water lots at $250 each, and all moneys received on sales or contracts of sale of any part of the property; with all payments, if any, made to Atwater, and debts incurred by Atwater to complainant since the said 27th May, 1853, and with such other demands, if any, as should in justice and equity be credited complainant.

At first we were in some doubt with which of the considerations, stated in the two bills of sale of 27th May, 1853, and 17th June following, complainant should be credited. They are both for the same property. The consideration of the first is $5,000, of the last, $7,560.95. As the case stands, we think he should be credited with the $7,560.95, for the following reasons: The first bill of sale bears date on the day the real estate was conveyed, but there is no evidence the two instruments were executed at the same time, or are parts of one and the same

transaction, while there are reasons for believing them different transactions. It was witnessed by Watrous, at Flint, and not at Saginaw. The bill of complaint makes no mention of any personal property sold to defendant when the real estate was conveyed. Neither does the answer of Atwater. It states Emerson was indebted to him in the sum of $30,000, and that the real estate was conveyed to him in consideration of that indebtedness. If the real estate paid the whole debt, how were the $5,000 paid Emerson for the personal property? It would seem, from Ashman's testimony, that Atwater, at the time the real estate was conveyed to him, contemplated an absolute purchase of the mill by himself and partner, Durfee, and that he stated in that event he would take all the personal property. Soon after his return to Buffalo he sent Dorr to take charge of the mill and personal property, in the name of Durfee & Atwater, and wrote and sent by Dorr the two letters we have already referred to. In his individual letter to Emerson he speaks of an inventory of the personal property. It is true, he says nothing of an appraisment or bill of sale to Durfee & Atwater. Dorr, however, says he had both verbal and written instructions from Atwater, in relation to the personal property, before he left Buffalo, and that he was to "take an inventory and delivery of the property, in due form, with prices all fixed and annexed." An inventory was taken with the prices fixed, and a bill of sale of it made out and executed by Emerson to Durfee & Atwater. It in no way affects the transaction, as it respects Emerson, that Durfee afterwards concluded not to be interested with Atwater in the purchase of the mill and personal property, as they were taken possession of by Dorr, and the business for a long time was carried on in the name of Durfee & Atwater; the latter in the end assuming the sole ownership. For these reasons we think complainant should be credited with the $7,560.95.

The commissioner must also inquire and report what part

of the real estate has been sold, and the price of each separate parcel; what part is under contract of sale and to whom, and at what price, and the amount paid and to be paid on such contracts; and what remains unsold and not under contract of sale. The commissioner to have power to examine the parties under oath, and to compel the production of all books, papers and contracts, necessary to the inquiry, and to take such further evidence, in addition to what has already been taken, relating to the reference, as may be offered by the parties, or he may deem proper. Let an interlocutory decree and order be entered accordingly.

To prevent any misconstruction of what we have said, we must be understood as speaking of Emerson's interest in the land conveyed to Atwater, and not of the Jennison interest, whatever that interest may be, as no mention is made of it in the pleadings, and it is referred to incidentally only in the testimony. What it is, does not appear from the papers before us.

MARTIN Ch. J. and CHRISTIANCY J. concurred.

CAMPBELL J. did not sit, having been of counsel in the case.