## CADMAN *v.* PETER.

*(Circuit Court, W. D. Michigan, S. D.* June 10, 1882.)

CONVEYANCE—MORTGAGE BACK—ABSOLUTE DEED.

A conveyance of land by a deed absolute on its face for the expressed consideration of $20,000, in notes of the grantee, which were received by the grantor,—the grantee giving back a mortgage of the same date as the deed to secure the payment of the notes given for the purchase price paid, and accepted by the grantor,—is an absolute deed and not a mortgage.

In Equity.

*Charles F. Burton* and *C. I. Walker,* for complainant.

*Harrison Geer* and *Ashley Pond,* for defendant.

WITHEY, D. J. The bill of complaint seeks to give to a deed the effect of a mortgage. In 1872 complainant borrowed of defendant his two promissory notes, payable to the order of Cadman at 90 days, for $5,000 each. They were renewed by defendant from time to time for the accommodation of complainant. The last renewal was between the fifteenth and twentieth of October, 1875, for the same time.

On the twenty-fifth of October, the bill states, defendant agreed to loan to complainant the additional sum of $20,000, by the notes of defendant payable at four and six months, and take a deed of 5,400 acres of land in Newaygo county, owned by complainant, of the estimated value of upwards of $40,000, as security for the payment of both sums, $10,000 and $20,000. The deed, absolute in form, was executed by complainant and wife, and delivered to defendant on the day last named, and at the same time defendant gave his notes to complainant for $20,000, the consideration named in the deed. The bill of complaint states the balance of the agreement as follows:

"Peter was to hold said land until such time as it might be sold at a profit, or for a greater sum than could be then realized, and when such time should come was to sell said land in the most advantageous manner possible, and out of the proceeds pay himself the said sums of $10,000 and $20,000, and interest and the taxes, and divide the surplus, if any."

The prayer is for an accounting, that the deed may be found to be an equitable mortgage, and that complainant may redeem. The answer denies the agreement to loan $20,000; denies that the deed was given as security; and states that defendant purchased the land from complainant for the consideration of $20,000, for which sum he gave his notes, and long since paid them. The answer denies that complainant has any interest whatever in the land, legal or

equitable, and says that complainant has not stated in his bill of complaint a cause of action. Complainant was, at the time of the alleged agreement, cashier in a bank in Detroit, and Peter was a lumber dealer in Toledo.

The case is an important one to the parties, and has been carefully considered as to the legal questions and the facts presented by the record. The first consideration relates to the nature of the transaction—whether the bill states a case which turns the deed into a mortgage, or mere security. Wherever there is a mortgage there is a right in the mortgagor or grantor to redeem the thing mortgaged. It need not be expressed, for the right to redeem will be implied wherever it is shown that property is transferred or pledged as security, unless the nature of the agreement forbids such implication. The agreement, set out in the bill of complaint and testified to by complainant, is, in effect, that Peter should take a deed of the land, effect a sale, and pay to Cadman one-half of the proceeds after deducting the purchase price or consideration, $30,000, and the taxes and interest. Such an agreement is inconsistent with the right to redeem. Peter, by the agreement, was entitled to hold the land until sold by him, and then share in any profit he might obtain; rights wholly inconsistent with the idea that Cadman could redeem. This being the agreement of the parties, allowing it to be valid, the deed cannot be turned into a mortgage. Defendant's counsel cited *Baker* v. *Thrasher*, 4 Denio, 493; *Macauley* v. *Porter*, 71 N. Y. 173.

The appropriate remedy would seem to be to compel the grantee to execute his agreement whenever a sale of the land can be made at a considerable profit. If, on the other hand, such agreement is obnoxious to the section of the statute of frauds declaring that no trust concerning or in any manner relating to land shall be created by parol, then the agreement cannot be enforced specifically nor employed to turn this deed into a mortgage security. Comp. Laws 1871, § 4692. See *Saunderson* v. *Groves*, 13 Rep. 364, (Law Rep. Com. Pl. 234.)

*Emerson* v. *Atwater*, 7 Mich. 12, cited by complainant's counsel, is distinguishable from this case. The agreement there was that the grantee might sell the land to pay the indebtedness of the grantor to the grantee, but the latter was to reconvey whatever land remained unsold; and if the grantor should pay the debt all the land was to be reconveyed. There an express right to redeem was reserved. In my judgment the agreement, if valid, would make Cadman a beneficiary under the deed, and created a trust in Peter concerning or

relating to land, and not being in writing and properly signed is void under the statute of frauds.

But, under the evidence, complainant is not, in my opinion, entitled to relief, conceding his bill to state a good case. It is insisted for complainant, and proved, that Cadman and Peter held and had for years intimate and confidential relations; that Cadman was in great need of money, a fact known to Peter; that Cadman endeavored to effect a loan upon the land as security, and was unsuccessful, of which Peter was informed; and that Cadman had estimates of the value of the land which led him to regard it worth largely in excess of $30,000, though in July previous he had purchased the land for about $20,000.

Neither Cadman nor Peter had seen the land, and pine lands were not in much demand at that time, October, 1875. It must be said that Mr. Cadman's testimony supports the material allegations of the bill of complaint, and there is an item of testimony strongly corroborating the case of the complainant. Mr. Russell testifies that when the parties came to him to have the deed drafted, Peter said, in substance, that he was going to take the land as security and let Cadman have $20,000 in addition to $10,000 he already had, but wanted a deed so that he, Peter, could control the land.

On the theory that the bill states a good case, I should regard the proof sufficient, in the absence of other and controlling testimony, to overcome the *prima facie* effect due to the absolute form of the deed, although the testimony of a witness who speaks from recollection of a conversation after five or six years have elapsed is often not the safest evidence on which to form opinions. We are all conscious of the imperfection of our memory, and that our recollection of what we have heard said is apt to get mixed and misplaced, especially if we have heard statements on the same subject from different persons. It is familiar that mere recollection, unaided by written memorandum, is entitled to very much less weight than written declarations made at or about the time. And the written declarations of the parties, to which I shall refer, are to my mind wholly inconsistent with any such statement having been made by Peter as that he took the deed as security. I shall briefly call attention now to the facts which control my judgment.

1. The conveyance of the land was by a deed, absolute on its face, for the expressed consideration of $20,000, to overcome the effect of which deed, and turn it into a mortgage, the evidence must be clear and convincing beyond reasonable controversy.

2. Peter gave back a mortgage to Cadman of the same date as the deed to secure payment of the notes given for the purchase price named, $20,000. This mortgage was given by one party and accepted by the other; it therefore speaks for both of them. It may not be conclusive, but in the absence of fraud a mortgage back at the time of a conveyance ought to be nearly so, as a contemporaneous writing expressive of the intention of the parties. It adds to the effect of the deed as evidence that there was an absolute sale.

3. January 21st Cadman wrote to Peter in substance that he had drawn on the latter at one day's sight to take up one of two $5,000 notes due that day, which Cadman could not get extended by renewal. The two $5,000 notes alluded to are continuations of the accommodation paper loaned in 1872 by Peter for Cadman's benefit, and according to Cadman's testimony were secured, together with the $20,000, by the deed to Peter. Peter had forwarded new notes to enable Cadman to retire the previous ones then about to fall due, and Cadman says in his letter that he had lodged one of the new notes as collateral to his draft. The draft directed the amount to be charged to Cadman's account. Peter replied January 22d, in which he says:

"I accepted your draft this morning. What do you think of making a draft on me at one day for $5,000? This shows for itself how my notes are peddled in Detroit. Let me know if I must raise the money to pay this draft. I want you to send me something to *show that the two notes and this draft are for your benefit and for you to pay.*"

Cadman testified that it was part of the arrangement, when the deed was executed, that Peter was to pay the said two notes. Would Peter have written in the manner he did if those notes were for him to pay and Cadman had secured him for the amount? And why should Cadman be asked to give something to show what Peter had no right to ask? Cadman replied, January 24th:

"I am sorely mortified and grieved that this should be the case, but I am entirely powerless to act. I will do anything in my power. I will send you my notes or anything I have."

We do not understand why Cadman should acquiesce in Peter's demand for something to show that Cadman was to pay the paper and that it was all for his benefit, unless Cadman so understood the fact. This occurred only three months after the date of the deed and alleged agreement. Again, January 30th, Cadman's pecuniary affairs had reached a climax, and he wrote Peter:

"I return your note for $5,000 herein. I cannot use it except to discredit you still more. I owe so much money outside I cannot stand the pressure: I am ruined and penniless. I console myself in your case that the *great bargain you made* in the *Newaygo lands* will in some great measure compensate you for the loss you must incur, for I cannot take care of the acceptance due early in February."

This acceptance was by Cadman of a draft drawn on him by Peter to pay the amount of the previous draft of Cadman on Peter at one day's sight, and was for $5,000. Cadman returned one of the $5,000 notes, which he did not use, and this left outstanding of the accommodation paper the acceptance and one note, aggregating $10,000, besides the notes for $20,000 given to Cadman at the date of the deed, and which had not yet matured. I am unable to reconcile the statements of this letter with Cadman's version of the understanding as to the purpose of the deed. He recognizes the fact that Peter had made "a great bargain" in the land in question—a bargain likely to compensate in a great measure the loss Peter must incur on account of Cadman. How had Peter made "a great bargain" in this land unless by a purchase of it and selling it for more than it cost? If Cadman had a beneficial interest, a right to redeem, or any sort of interest in the land, or in the proceeds of any sale, would he have made the statements of the letter? In his testimony he claimed the land to be worth at that time a large sum in excess of the amount he had received Peter's paper for. If the deed was understood to be security there was no reasonable ground for loss to Peter. No man of common prudence and understanding would have written such a letter while he regarded himself as the owner in equity of, or as having a valuable beneficiary interest in, the land.

A decree will be entered dismissing the bill of complaint for want of merits.