## SELIK v. GOLDMAN REALTY CO.

1. MORTGAGES—DEED AS MORTGAGE.
   A deed, although absolute on its face, given as security, is a mortgage, and, once a mortgage, it is always a mortgage.

2. SAME—EVIDENCE—ORAL PROOF ADMISSIBLE.
   Oral proof is permissible to show that a deed was given to secure a loan, and therefore in legal effect operated as a mortgage only.

[1]Mortgages, 41 C. J. § 64; [2]Id., 41 C. J. § 118; L. R. A. 1916B, 18; 19 R. C. L. 245, 248, 259, 260.

3. SAME—EFFECT OF ACCEPTANCE OF OPTION BY GRANTOR.

 While the acceptance of an option to repurchase property by the party deeding it is some evidence that the deed is what it imports, it is not conclusive in the face of convincing proof to the contrary.

4. SAME—CONSIDERATION—DISPARITY BETWEEN VALUE AND CONSIDERATION—POSSESSION.

 Evidence that the actual value of property deeded greatly exceeded the consideration and that the grantor continued in possession tends to show that the deed was intended as a mortgage only.

5. SAME — EVIDENCE — TRUST RELATIONS BETWEEN PARTIES OF SIGNIFICANCE.

 That trust relations in fact and law existed between the grantor and grantee's manager is of some significance in determining whether a deed, absolute on its face, was in fact given as security merely for money advanced, under the circumstances of the case.

6. SAME—EVIDENCE—SUFFICIENCY.

 The decree of the court below determining a deed, absolute on its face, to be a mortgage, *held*, justified by the proofs.

Appeal from Livingston; Collins (Joseph H.), J. Submitted January 26, 1927. (Docket No. 14.) Decided December 1, 1927.

Bill by Joseph L. Selik against the Goldman Realty Company to have a deed decreed a mortgage with right to redeem therefrom. From a decree for plaintiff, defendant appeals. Affirmed.

*Benjamin, Betzoldt & Bassett,* for plaintiff.

*Samuel J. Rhodes,* for defendant.

SHARPE, C. J. Plaintiff's bill was filed August 12, 1924, to have a deed dated February 15, 1924, for certain property fronting on Island lake in Livingston

[3]Mortgages, 41 C. J. § 110 (Anno); [4]Id., 41 C. J. § 101; [5]Id., 41 C. J. § 95; [6]Id., 41 C. J. § 123.

county declared a mortgage, with right to redeem there-from by paying defendant the amount of borrowed money it secured, with interest.   Defendant answered in denial, claiming it had purchased the property outright as the deed imports, and the money it then paid was the purchase price for the property therein described.

The case was heard on pleadings and proofs taken in open court, resulting in a decree for plaintiff granting the relief asked.    The conclusion reached by the trial court in summarizing the case being that:

"After considering all the testimony, the court is of the opinion that this transaction did constitute a loan and that the deed given was given as security therefor."

If so, the deed when given was a mortgage and once a mortgage always a mortgage is the general rule. *Swetland* v. *Swetland*, 3 Mich. 482; 19 R. C. L. p. 245, § 7.   The law is well settled that oral proof is permissible to show that a deed was given to secure a loan and therefore in legal effect operated only as a mortgage.   This case is essentially one of facts, the oral evidence being in direct conflict as to the intent and mutual understanding of the parties.   The direct written evidence of the transaction consists of the short form warranty deed in question and the following option, dated six days later:

"February 21, 1924.
"JOSEPH SELIK,
   "Detroit, Michigan.
   "*Dear Sir:*   In accordance with verbal understanding we herewith propose to grant you an option covering the purchase of lots Nos. 33 and 34 situated on Island lake, Livingston county; otherwise known as section 4, town 1 N., range 6 E., together with frame cottage situated thereon.
   "It is understood that this option expires August 21, 1924.    Price to be $2,750 plus interest at 6 per cent. from date hereof.

"Terms to be net cash when this option is exercised. The above price including taxes for year 1922. .

                              "GOLDMAN REALTY COMPANY,
"Accepted:                     "(Signed)   L. GOLDMAN,
   "JOSEPH L. SELIK.                  V. Pres."

The land covered by the deed in question had a water frontage on Island lake of 85 feet, extending back to a highway. It consisted of two lots in a subdivision, called Island Lake Colony Subdivision Annex, numbered 33 and 34, less a strip 5 feet wide taken from the northerly side of the latter lot for a driveway.

Prior to January, 1921, plaintiff purchased from the owners under a land contract lot 34, which had a shore frontage of 60 feet, at the contract price of $30 per front foot and started building an 8-room summer home upon it; but later learned that he had inadvertently extended his building over the line onto lot 33, which was only 30 feet wide. He then made a deal with the owners by which he gave them the 5-foot strip off lot 34 and $350 in cash for lot 33, receiving a deed for it which was duly recorded on March 22, 1921. During the summer of 1921 he completed building his summer cottage, partly on both lots, at a cost of $2,000, and thereafter occupied it with his family as their summer home.

An apparently disinterested witness named Brown, who owned land in that locality and qualified as to knowledge of values, testified at the hearing, in August, 1924, that the market value of those lots was $35 per front foot, exclusive of improvements, and they had been selling lake frontage there at that price for the past year or two.

When he bought and built upon those lots in 1921, plaintiff was in business for himself, and so continued for some years after, but, before this deed was given, became financially embarrassed and Louis Goldman, a director and vice-president of defendant Goldman Realty Company, had been appointed his receiver.

The Goldman Realty Company was composed of said Louis Goldman, his father, and brothers, who were also organized into a corporation called the Riverside Machinery Depot, of which Louis was a director and its treasurer.    He was defendant's chief witness and testified:

"They both occupy the same office.    The officers in one are practically the officers in the other."

His assumptions and the tone of his testimony suggest that he was practically the manager and voice of both whenever he wanted to be.    He and Selik had long known each other and apparently been friends for many years.    Following his failure in business and appointment of Goldman as his receiver, Selik's money stringency became acute.    He had pawned his jewelry, which it would require $1,250 to redeem, and was about to lose it when on his solicitation his friend Goldman redeemed it for him, taking his note for the amount and the jewelry as security.    Before the transaction involved here arose and while his business assets were yet in Goldman's hands as receiver, Selik was given employment as a salesman with the Riverside Machinery Depot, but was unable to keep up the payments on his land contract for lot 34 and the owners of the contract took steps for its foreclosure. The money necessary to pay the balance due on the contract, back taxes, insurance, etc., and clear up all his indebtedness in connection with that lake frontage property amounted to $1,645.17.    He first applied, as he testified, to Goldman to advance him that amount from money which Goldman had in his hands as receiver of Selik's estate, which Goldman refused.

Several interviews between them on that subject followed.    Their testimony is in direct conflict as to what was said, understood, and agreed upon between them relative to this deed, which Selik and his wife executed on February 15, 1924, and delivered to Goldman; but

the latter thereafter paid the various parties entitled to it the $1,645.17, and obtained a deed to defendant for lot 34 from the fee owners, resulting in a clear and unincumbered record title in defendant to the entire lake frontage property described in this deed, claimed by Selik to have been given as security for a loan to him of that money so applied. Goldman directly denied any such understanding or agreement, and testified that when repeatedly applied to for such loan by Selik he refused him, but on Selik's importunities and representations that if his property was saved from being lost through the impending foreclosure he could and would find a purchaser for it at its approximate value, Goldman, through friendship, consented to arrange for its purchase by defendant and give him an option to sell it for defendant at an advanced price with a division of the profits.

Most of the testimony in this record is that of Selik and Goldman. No other member of defendant or its allied company which had employed Selik was heard. What defendant thought, said, did, and understood is only disclosed and personified in Goldman's acts and utterances. The testimony of those two chief witnesses is too lengthy for review in detail. Its general import is indicated by the following excerpts:

Selik testified in part as follows:

"I asked Mr. Goldman to save my property and pay whatever indebtedness there was on it. He said he would look it over. He went down to look it over. He said to me, 'All right, we will take it up but I will have to get that money from the Goldman Realty Company,' and he told me down town to make him a deed to this property. I was satisfied to give him a deed. Because I made other big loans on my property and I gave deeds which I will prove were always recorded as mortgages. * * *

"As to what agreement I had, if any, with Mr. Goldman at the time, after I assigned the deed to him, he said, 'The boys,' that is he meant his brothers, his

partners, 'want to have a one thousand dollar bonus for that loan and I was employed there.' And a few days later he handed me a paper to be signed, by paying him $2,750 back in six months' time, he will return the property back to me. At the time or prior to the time of signing the deed there was nothing said about deeding back. * * * Before I had this deed made out I had a conversation with Mr. Goldman about I want to raise money to pay up to the Burton Company on this property and I tried to get some of the money of the receivership. He says he couldn't give it to me, and he said he will have to loan me some money from the Goldman Realty Company, and they didn't say anything else but loan the money and to pay up, and I had expectations to sell this property and I expected I will sell it and pay him up the money, as much as he advanced. * * *

"I never intended to sell this property to the Goldman Realty Company. Never even talked about selling that property at all. They didn't ever say anything to me. They never said a word to me about buying this property—not a word. When I asked them to make out this deed and sign it they said it was just for security as a mortgage for the loan they made from the realty company. Yes, I am willing to pay them back at this time the money I owe them, with interest. * * * They said they were my best friends. I trusted not only to permit this, I could tell thousands of dollars I trusted, and he has mistreated me."

After general denial and assertion that he had positively refused more than once to loan Selik this money, Goldman testified in part:

"About three or four days later, he came into the office again and repeated his request for a loan which I turned down. I think he made four or five requests of me, and finally I told him that I would buy the property and I agreed to pay his note and pay the money that he was getting on the property and take a deed for it. Well, he said he would rather see me have it than to see it lost to somebody else, and he agreed to sell me the property for the amount of the

charges against it. * * * There was absolutely no understanding either verbal or otherwise at the time I got the deed on February 15, 1924, or prior to that time, that I was simply loaning him the money, because he understood perfectly well that I wouldn't loan him any additional money. * * * On February 21, 1924, the date of this option, Mr. Selik, who was always in our employ during all of these transactions, came in on the morning of the 21st, and he told me he had an opportunity to sell that property for $4,500, and I then told him that if he could, I would give him an option to make some money on it, and I agreed then to give him an option for six months to buy it back at $2,750, which I did. There had absolutely nothing been said either by me or by him about an option prior to that time. This action on my part was purely voluntary."

Selik testified that he protested against signing the option after the deed was given, but thought it was the only thing he could do because he didn't have anything to show his interest and he had found a customer who would pay $3,500 cash for the property. That deal fell through apparently over Selik, or the attorneys to whom he intrusted it, insisting on his paying defendant only the amount it had advanced for the property, with interest, and this bill was filed before the six months' limit of the option had expired.

While it has been held, as defendant's counsel claims in his brief, that accepting an option after giving a deed to property is evidence that the instrument was what it imports, we are not persuaded that rule is conclusive under the circumstances of this case. It is met by inadequacy of the amount advanced as compared with the actual value of the property, which defendant's answer admits was about $4,500, while plaintiff shows it much more, and the convincing proof that plaintiff retained possession of the property, occupying it for his summer home as before, keeping his household effects there with the house locked when

absent and was in actual occupation of it at the time of this trial.    Defendant's claim of having taken possession is not sustained.    Its only gesture in that direction is a showing that defendant at one time posted a notice on the place, in Selik's absence, that it had the place for rent, which Selik took down when he discovered it.

"Thus, evidence to the effect that the actual value of the property greatly exceeded that of the consideration, it is universally conceded tends to show the transaction a mortgage."    19 R. C. L. p. 259.

*Vide,* also, *Schmidt* v. *Barclay,* 161 Mich. 1 (20 Ann. Cas. 1194) ; *Simpson* v. *National Bank,* 93 Fed. 309; *Newman* v. *Edwards,* 22 Neb. 248.

"The continued possession of the grantor long after the recording of his deed to another is sufficient to raise a presumption that the right to the same has been retained, or arises from some right acquired by him in the land."    *Stevens* v. *Hulin,* 53 Mich. 93 (citing *Bloomer* v. *Henderson,* 8 Mich. 395 [77 Am. Dec. 453] ; *Bennett* v. *Robinson,* 27 Mich. 26).

An illuminating discussion of this subject, and the general attitude of the courts in dealing with it, is found in the early leading case of *Emerson* v. *Atwater,* 7 Mich. 12.

That trust relations in fact and law existed between Selik and Goldman is of some significance in this contention.    Goldman was receiver of Selik's business and vested with a trust in that connection.    Selik testified he had, as such, custody of money which belonged to Selik and his creditors.    That Goldman had acted as Selik's friend and rescued his jewelry from pawn naturally won the latter's confidence and trust in him.    While Goldman features this, it is to be noted he properly guarded himself from loss.    He admits receiving full payment with interest and protest fees from Selik's attorney in the receivership, of which he

makes no mention beyond naming the attorney as such.

We see no reason to disturb the decree.    It is affirmed, with costs to appellee.

BIRD, FELLOWS, WIEST, CLARK, and MCDONALD, JJ., concurred.

The late Justice SNOW and Justice STEERE took no part in this decision.